AO 241
(Rev. 06/13)

1:22CV 1319-EPG (HC)

Page 2

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Southern |
|---|---|

| Name (under which you were convicted): DANIEL RODRIGUEZ QUINTERO | Docket or Case No.: C. of App # D077996 S.D.S.C.# SCS30337 |
|---|---|

| Place of Confinement : P.O. Box 8500, Coalinga CA 93240 Pleasant Valley state Prison | Prisoner No.: BN3161 |
|---|---|

| Petitioner (include the name under which you were convicted) Daniel R. Quintero v. | Respondent (authorized person having custody of petitioner) Warden Tristan FILED |
|---|---|

The Attorney General of the State of:

## PETITION

OCT 17 2022

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ___ SMG
DEPUTY CLERK

1.    (a) Name and location of court that entered the judgment of conviction you are challenging:

San Diego County Superior Court

_____

(b) Criminal docket or case number (if you know): _____

2.    (a) Date of the judgment of conviction (if you know): _____

(b) Date of sentencing: 09/16/2022

3.    Length of sentence: L.W.O.P

4.    In this case, were you convicted on more than one count or of more than one crime?    ☐ Yes    ☐ No

5.    Identify all crimes of which you were convicted and sentenced in this case:

PC187 [8] Murder 1st
PC209 (a)[3] Kidnap, Ransom, Extortion
PC206 [1] Torture

_____

_____

6.    (a) What was your plea? (Check one)

☒ (1)    Not guilty    ☐ (3)    Nolo contendere (no contest)

☐ (2)    Guilty    ☐ (4)    Insanity plea

RECEIVED

OCT 17 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ___
DEPUTY CLERK

AO 241
(Rev. 06/13)

Page 4

(5) Citation to the case (if you know): _____

(6) Grounds raised:   Sixth Amendment Violation

See exhibit "A"

See exhibit "B"

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?    ☐ Yes    ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?    ☐ Yes    ☒ No

11. If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

AO 241
(Rev. 06/13)

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court: _____

    (2) Docket or case number (if you know): _____

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _____

    (5) Grounds raised: _____

      _____

      _____

      _____

      _____

      _____

      _____

      _____

      _____

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ❏ Yes    ❏ No

    (7) Result: _____

    (8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court: _____

    (2) Docket or case number (if you know): _____

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _____

    (5) Grounds raised: _____

      _____

      _____

      _____

      _____

      _____

      _____

      _____

      _____

AO 241
(Rev. 06/13)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes       ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:      ☐ Yes       ☐ No

(2) Second petition:    ☐ Yes       ☐ No

(3) Third petition:      ☐ Yes       ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:** Sixth Amendment violation. Right to represent self.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

I was denied the right to review evidence by the public defender, I was denied investigation, intreview of witness. I was denied ability to select defense theory. I was obstructed by the court to represent my self by denying Co-counsel in a death penalty case. I did Not want a "voluntary Intoxication" defense, I wanted a different theory and due to the severe obstruction by the court I was denied 6th

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

_____

_____

_____

AO 241
(Rev. 06/13)

Page 7

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☒ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _P. C. = 1237 (a)_

Name and location of the court where the motion or petition was filed: _4TH App District_

_Div. 1 San Diego CA_

Docket or case number (if you know): _NO 77996_

Date of the court's decision: _May 11 2022_

Result (attach a copy of the court's opinion or order, if available): _Denied in part_

_granted in part_

_____

(3) Did you receive a hearing on your motion or petition?    ☒ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☒ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☒ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _4th App District_

_Div. 1 San Diego CA_

Docket or case number (if you know): _NO 77996_

Date of the court's decision: _May 11 2022_

Result (attach a copy of the court's opinion or order, if available): _Denied in_

_part granted in part_

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241
(Rev. 06/13)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c). **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☐ Yes    ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

AO 241
(Rev. 06/13)

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?          ☐ Yes   ☐ No

(4) Did you appeal from the denial of your motion or petition?          ☐ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two: _____

_____

_____

**GROUND THREE:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

AO 241
(Rev. 06/13)

Page 10

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)     **Direct Appeal of Ground Three:**

      (1) If you appealed from the judgment of conviction, did you raise this issue?     ☐ Yes    ☐ No

      (2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)     **Post-Conviction Proceedings:**

      (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

           ☐ Yes     ☐ No

      (2) If your answer to Question (d)(1) is "Yes," state:

      Type of motion or petition: _____

      Name and location of the court where the motion or petition was filed:

_____

      Docket or case number (if you know): _____

      Date of the court's decision: _____

      Result (attach a copy of the court's opinion or order, if available): _____

_____

      (3) Did you receive a hearing on your motion or petition?     ☐ Yes    ☐ No

      (4) Did you appeal from the denial of your motion or petition?     ☐ Yes    ☐ No

      (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

      (6) If your answer to Question (d)(4) is "Yes," state:

      Name and location of the court where the appeal was filed: _____

_____

      Docket or case number (if you know): _____

      Date of the court's decision: _____

      Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

AO 241
(Rev. 06/13)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why _____

_____

_____

_____

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☐ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?                          ☐ Yes        ☐ No

(4) Did you appeal from the denial of your motion or petition?                  ☐ Yes        ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes        ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four:

AO 241
(Rev. 06/13)

13.    Please answer these additional questions about the petition you are filing:

(a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court

having jurisdiction?    ☒ Yes    ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them: _____

_____

_____

_____

(b)    Is there any ground in this petition that has not been presented in some state or federal court? If so, which

ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

_____

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

that you challenge in this petition?    ☐ Yes    ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues

raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy

of any court opinion or order, if available. _____

_____

_____

_____

_____

_____

_____

_____

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

the judgment you are challenging?    ☐ Yes    ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

raised. _____

_____

_____

_____

_____

_____

AO 241
(Rev. 06/13)

Page 14

16.    Give the name and address, if you know, of each attorney who represented you in the following stages of the

judgment you are challenging:

(a) At preliminary hearing: Mignon Hilts
303 "H" st suite 400 chula Vista CA 91910

(b) At arraignment and plea: M. Hilts

(c) At trial: M. Hilts

(d) At sentencing: M. Hilts

(e) On appeal: J.P. Dwyer
601 Van Ness Ave. suite E115 San Francisco CA 94102

(f) In any post-conviction proceeding: Supreme Court request
for Review

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are

challenging?    ☐ Yes    ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

future?    ☐ Yes    ☐ No

18.    TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

N/A

AO 241
(Rev. 06/13)



\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in

part that:

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in
        custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

        (A)     the date on which the judgment became final by the conclusion of direct review or the expiration
                of the time for seeking such review;

        (B)     the date on which the impediment to filing an application created by State action in violation of
                the Constitution or laws of the United States is removed, if the applicant was prevented from
                filing by such state action;

        (C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court,
                if the right has been newly recognized by the Supreme Court and made retroactively applicable to
                cases on collateral review; or

        (D)     the date on which the factual predicate of the claim or claims presented could have been
                discovered through the exercise of due diligence.

AO 241
(Rev. 06/13)

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:

N/A

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

Proper

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on Sep. 6, 2022 (month, date, year).

Executed (signed) on Sep. 6. 2022 (date).

_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____
_____
_____
_____

# EXHIBIT A

# IN THE COURT OF APPEAL
## OF THE STATE OF CALIFORNIA
## FOURTH APPELLATE DISTRICT
## DIVISION ONE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) No. D077996 |
| | ) |
| | ) San Diego County Superior Court |
| Plaintiff and Respondent, | ) No. SCS303737 |
| | ) |
| v. | ) |
| | ) |
| DANIEL RODRIGUEZ QUINTERO, | ) |
| | ) |
| Defendant and Appellant. | ) |

## APPELLANT'S OPENING BRIEF

Appeal from the Judgment of the Superior Court
of the State of California for the
County of San Diego

Honorable Timothy Walsh, Judge

John P. Dwyer, SBN 106860
DWYER + KIM, LLP
601 Van Ness Ave., Suite E-115
San Francisco, CA 94102
Telephone: 415.994.2893
Email: dwyer@dwyerkim.com

Attorney for Appellant,
DANIEL RODRIGUEZ QUINTERO

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... 3

STATEMENT OF APPEALABILITY ...................................................... 5

STATEMENT OF THE CASE .............................................................. 5

STATEMENT OF FACTS .................................................................... 6

ARGUMENT ................................................................................... 17

I.    The convictions must be reversed because the trial court failed to exercise its discretion when it denied Quintero's request for advisory counsel ................................................ 17

    A.    Factual and procedural background ......................... 17

    B.    Quintero timely requested advisory counsel ............ 19

    C.    The trial court abused its discretion because it failed to exercise its discretion when it summarily denied Quintero's request for advisory counsel ....... 21

    D.    Because it would have been an abuse of discretion to deny Quintero's request for advisory counsel, the convictions are reversible per se ......................... 24

        1.    The charges were extremely serious ............... 25

        2.    The case was legally and factually complex ... 26

        3.    Quintero had no legal knowledge, experience, or ability .......................................................... 28

        4.    There was no evidence that Quintero sought advisory counsel for manipulative purposes .......................................................... 29

        5.    Granting the request for advisory counsel would have advanced the twin goals of assisting Quintero in representing himself and of promoting the orderly, prompt, and just disposition of the case ............................... 29

    E.    *Bigelow* is not limited to capital cases ...................... 31

II.    The minutes and abstract should be corrected to delete the criminal justice administrative fee ................................. 35

CONCLUSION ................................................................................. 36

CERTIFICATE PURSUANT TO RULE 8.360(b)(1) ................................. 37

TABLE OF AUTHORITIES

**Cases**

*Chaleff v. Superior Court* (1977) 69 Cal.App.3d 721.................... 19

*Faretta v. California* (1975) 422 U.S. 806..................................... 34

*F.T. v. L.J.* (2011) 194 Cal.App.4th 1........................................... 22

*Illinois v. Allen* (1970) 397 U.S. 337 ........................................... 34

*Indiana v. Edwards* (2008) 554 U.S. 164..................................... 30

*In re Cortez* (1971) 6 Cal.3d 78..................................................... 23

*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429 ........................... 22

*McKaskle v. Wiggins* (1984) 465 U.S. 168 .................................... 30

*O&C Creditors Group, LLC v. Stephens & Stephens XII, LLC*
    (2019) 42 Cal.App.5th 546 .................................................... 20

*People v. Banks* (2015) 61 Cal.4th 788.......................................... 27

*People v. Belmontes* (1983) 34 Cal.3d 335..................................... 21

*People v. Bigelow* (1984) 37 Cal.3d 731............17, 24-26, 28, 31, 33

*People v. Burton* (1989) 48 Cal.3d 843 .......................................... 21

*People v. Chadd* (1981) 28 Cal.3d 739........................................... 34

*People v. Choi* (2021) 59 Cal.App.5th 753............................... 22, 31

*People v. Clark* (1992) 3 Cal.4th 41............................................... 34

*People v. Clark* (2016) 63 Cal.4th 522........................................... 27

*People v. Crandell* (1988) 46 Cal.3d 833 ......................21-25, 28-29

*People v. Debouver* (2016) 1 Cal.App.5th 972 ............................... 31

*People v. Frank* (1985) 38 Cal.3d 711............................................ 21

*People v. Garcia* (2000) 78 Cal.App.4th 1422 ................... 27, 32-33

*People v. Gutierrez* (2014) 558 Cal.4th 1354................................. 21

*People v. Hamilton* (1989) 48 Cal.3d 1142..................................... 20

*People v. Harrison* (2013) 215 Cal.App.4th 647 ........................... 33

*People v. James* (2011) 202 Cal.App.4th 323................................. 27

*People v. Lewis* (2001) 25 Cal.4th 610........................................... 26

*People v. Mattson* (1959) 51 Cal.2d 777 ......................21, 24-25, 29

*People v. Sandoval* (2015) 62 Cal.4th 394 .................................... 26

*People v. Scott* (1978) 21 Cal.3d 284 ............................................ 21

*People v. Streeter* (2012) 54 Cal.4th 205 ...................................... 26

*People v. Sullivan* (2007) 151 Cal.App.4th 524 ........................... 31

**Statutory Provisions**

Civ. Code, § 3528 ........................................................................ 20

Gov. Code, § 6111, subd. (a) ......................................................... 35

Gov. Code, § 6111, subd. (b) ......................................................... 35

Pen. Code, § 187, subd. (a) ........................................................... 5

Pen. Code, § 190.2, subd. (a)(17)(B) .............................................. 5

Pen. Code, § 190.2, subd. (a)(18) ................................................... 5

Pen. Code, § 206 ........................................................................... 5

Pen. Code, § 209, subd. (a) ........................................................... 5

Stats. 2020, ch. 92, § 2 ................................................................. 35

Stats. 2020, ch. 92, § 11 ............................................................... 35

## STATEMENT OF APPEALABILITY

This appeal follows a jury trial and sentencing. Accordingly, the appeal is authorized by Penal Code section 1237, subdivision (a).

## STATEMENT OF THE CASE

Daniel Rodriguez Quintero was charged by an indictment with murder (Pen. Code, § 187, subd. (a)); kidnapping for ransom, reward, or extortion (Pen. Code, § 209, subd. (a)); and torture (Pen. Code, § 206). The murder charge included kidnapping and torture special circumstance allegations (Pen. Code, § 190.2, subds. (a)(17)(B), (a)(18)), and the kidnapping charge included an allegation that the victim suffered death or was confined in a manner that exposed him to a substantial likelihood of death (Pen. Code, § 209, subd. (a)). (1 CT 9-10.)

On June 29, 2020, a jury found Quintero guilty of all charges and found true all special allegations. (2 CT 452-453 [minutes]; 2 CT 454-456 [verdict forms]; 19 RT 3620-3622.)

On September 16, the court imposed a sentence of life without parole for each of the murder and kidnapping convictions and a sentence of life for the torture conviction. Pursuant to Penal Code section 654, the court stayed the sentences for kidnapping and torture. (2 CT 460-461 [minutes]; 2 CT 388 [abstract]; 20 RT 3728.) The court imposed a court operations assessment of $120, a criminal conviction assessment of $90, a criminal justice administrative fee of $154, and a restitution fine of $10,000. The court ordered restitution of $7,074.37 payable to the Victim Compensation Board, reserved jurisdiction over

restitution payable to the victim's family, and ordered 776 days of credit.  (2 CT 460 [minutes]; 2 CT 389 [abstract]; 20 RT 3728.)

Quintero timely filed a notice of appeal on September 18, 2020.  (2 CT 390.)

### STATEMENT OF FACTS

*Prosecution case.*  Jesus Quiroz co-owned a tattoo shop on the second floor of a small building in Chula Vista.  (8 RT 1360.) His brother, Jose, owned a t-shirt store on the ground floor.  (8 RT 1358-1359.)  The brothers trafficked in drugs.  (8 RT 1356; 9RT 1547, 1563-1564.)

On the night of December 16, 2017, Jesus and Jose attended a car show where Jose displayed his shirts for sale.  (8 RT 1387.)  Afterward, Jesus returned to his tattoo shop and, at about 8:30 or 9:00 p.m., Jose returned to his t-shirt store, where Jesus helped him to unload unsold merchandise.  (8 RT 1388-1389, 1392.)  Jose soon left to deliver drugs to a customer and thereafter went home.  (8 RT 1392-1394, 1397.)

Sometime before midnight, Jesus's friend, Manuel Arellano, came by the tattoo shop, where the two of them drank alcohol and listened to music.  (8 RT 1398-1399; 10 RT 1794-1796.)  At around 3:00 a.m., Arellano's fiancé picked him up to go home.  (10 RT 1797; 11 RT 2128-2132.)  He did not see anyone outside when he left the building.  (10 RT 1798, 1802.)

According to Jose, sometime between 3:00 and 3:30 a.m., Jesus called his brother and said that Quintero was outside of the building.  Jose told him to close the front door because Quintero was not their friend.  (8 RT 1399-1400, 1418; Exh. 4, line 9 [call log showing an eight-minute call from "Lito" (i.e., Jesus) to Jose

at 3:06 a.m.].) Jesus said he would call Jose back. (8 RT 1418.)
Several minutes later, when Jesus had not called back, Jose
called him. When Jesus answered the phone, Jose could hear
"some sort of argument." (8 RT 1419, 1421; Exh. 4, line 13 [call
log showing an eight-minute call from Jose to Jesus at 3:16
a.m.].) Jesus, who sounded "a little bit more scared," gave the
phone to Quintero, who told Jose that "somebody" owed him a
million dollars. (8 RT 1421-1422.) Quintero then said that
Ramon Garcia, a mutual friend, owed Quintero the money. (8 RT
1423.)

After that call ended, Jose called Jesus again, but there
was no answer. (8 RT 1424.) He then reached Quintero through
Facebook Messenger. (8 RT 1424-1425; see also 8 RT 1464 [a call
log showing a 22-minute Facebook Messenger connection
between Jose and Quintero at 3:45 a.m. and another 22-minute
connection at 4:09 a.m.].) Jose could hear "scuffling" in the
background. (8 RT 1425.) Quintero told him, "Somebody owes
me money here." (8 RT 1425.) Jose could hear Jesus's voice and
thought it sounded as if he was "suffering." (8 RT 1426.) He
heard Jesus say, "Hey, okay. That's it. You guys. You guys
already hit me. You know, you guys already did what you did.
You know, you guys already hit me, and you know, that's it. You
know, let's just call that it." Jose thought that Jesus was begging
for his life. (8 RT 1426.) Quintero told Jose, "If you hang the
phone, you call the cops, I'm going to kill your brother." (8 RT
1426-1427.) Quintero told someone in Spanish, "Mete la una
botella por culo" – i.e., "put a bottle in his ass" (8 RT 1428), but

Jose did not know if Quintero was being serious (9 RT 1590).[1]
Jose also heard a third person's voice, which he did not recognize.
(8 RT 1427.)  Jose could hear "pushing, shoving" and "scuffling."
(8 RT 1429.)

At one point, Quintero's voice became softer and he said to
Jose, "Hey, because they're trying to kill me and my family."  But
then Quintero "went back to his act" and Jose heard more
scuffling.  (8 RT 1429-1430.)  Jose thought Quintero did not want
the other person to hear what he had just said.  (8 RT 1430-1431.)

Quintero changed his demand to $5,000.  (8 RT 1431.)
When Jose said he had $2,000 at home and could make calls to
get the rest, Quintero said, "Well, if you hang the phone, I'm
going to kill him," and "So that's what your brother's worth?
$2,000?  You think this the first time I do this?"  (8 RT 1431-
1432.)

Jose called Ramon Garcia several times and eventually
reached him.  Garcia denied owing Quintero money and refused
to go to the tattoo shop.  (8 RT 1434-1435; 9 RT 1665, 1668-1669.)
Garcia called Quintero, who told him to "stay out of it."  (9 RT
1668-1669.)

Jose called other people asking them to go to the tattoo
shop.  (8 RT 1438, 1442.)  Miguel Lopez agreed to drive to the
tattoo shop, where he met with Manuel Mariscal.  (9 RT 1518-
1519; 10 RT 1761.)  Lopez saw blood on the sidewalk by the front
door and on the walls by the inside stairs.  (9 RT 1521, 1537.)

---

[1] There were no internal or external injuries to Jesus's anus.  (11
RT 2196-2197.)

Mariscal anonymously called 911 and falsely told the operator he had seen three men go in the building with guns. (10 RT 1763.) Police arrived around 7:30 a.m. (10 RT 1830, 1833.) After inspecting the exterior of the building and finding nothing suspicious, they left. (10 RT 1833-1834.) At about the same time, Jose called Quintero, who told Jose to come to Tijuana with the money. (8 RT 1454.)

At around 8:00 a.m., Christiana Rios, Jesus's former girlfriend, got a call from Jose, who told her that "they" were holding Jesus for ransom in the tattoo shop. (8 RT 1346-1347.) As Jose's request, she called 911 and relayed the information he had given her. (8 RT 1348.) She then met Jose at a nearby restaurant to get the key to the tattoo shop. (8 RT 1349.) He told her not to tell the police that she got the key from him. (8 RT 1351-1352.) She drove to the tattoo shop and gave it to the police, who had returned to the scene. (8 RT 1349; 11 RT 1838.)

Police found no signs of forced entry to the building. (12 RT 2393-2394.) There was blood on the tiled entryway and on the wall and internal stairs leading to the second floor. (10 RT 1840.) Jesus was dead on the floor of the tattoo shop. (10 RT 1842, 1871.) He was naked from the waist down. (10 RT 1870.) His ankles were bound with his shoe laces, and an electrical cord was wrapped loosely around his legs. (10 RT 1870, 1881; 11 RT 2145, 2183-2185; 12 RT 2344-2345.)

Jesus suffered blunt force trauma that caused bruising and abrasions to his head, face, neck, torso, and upper and lower extremities. (11 RT 2145.) He had a small skull base fracture

and bruising and bleeding around and on his brain. (11 RT 2146.) His nose was broken, and he had bruising and lacerations near his eyes. (11 RT 2150-2151.) There were fractures to the hyoid bone, the thyroid cartilage, and the cricoid cartilage, and injuries to the neck muscles and ligaments. (11 RT 2172-2173.) The cause of death was blunt force trauma to his head and neck. (11 RT 2174.) No single injury was the cause of death. (11 RT 2192.) The deputy medical examiner could not determine the exact time of death. (11 RT 2191.)

A shoe print found at the crime scene had a distinctive pattern and the "Polo" logo and had the same class characteristics as a pair of Polo sandals seized during a search of Quintero's home. (10 RT 1913; 11 RT 2049-2051.) Quintero's fingerprints were on a Bud Light bottle and a Hornitos tequila bottle in the tattoo shop. (10 RT 1875, 1877, 1939-1941.) The fingerprint on the Hornitos bottle was in Jesus's blood. (10 RT 1877, 1885-1886; 11 RT 2743; 13 RT 2524-2525.) Quintero's DNA was not found on any items in the tattoo shop, including the bindings. (14 RT 2741-2744.)

A fingerprint and palmprint belonging to Jose Zazueta-Sanchez was found on the exterior door to the tattoo shop. (10 RT 1943; 12 RT 2383.) Jesus's family members told investigators that Zazueta-Sanchez had no known connection to the tattoo shop. (12 RT 2383.) He was murdered in Mexico in February 2018. (12 RT 2383-2384, 2389.)

Records from the Big 7 Motel, which was nearly adjacent the tattoo shop, showed that Quintero checked in on December 15

and checked out on December 17. (9 RT 1556; 10 RT 1812-1813.)
On December 17, at about 2:00 a.m., Quintero could be seen on a
security video walking with other men to a liquor store, which
was less than a block north of the motel and the tattoo shop. (12
RT 2361-2363, 2365; Exh. 27.) Police collected security video
from Car Audio across the street from the tattoo shop, but the
quality of the video was too poor to make out any details of what
transpired or to identify any individuals. (11 RT 2070-2071,
2122.)[2]

In the days after Jesus's death, Quintero threatened Garcia
and his family in Tecate, Mexico. (9 RT 1670-1671.) Quintero
also sent Garcia a text stating that unnamed people were holding
him against his will, that "they" were beating him, and that they
would kill him unless Garcia sent $5,000. His texts included
photographs purporting to show injuries to his face. (9 RT 1671,
1673-1675, 1688; 11 RT 2074; Exh. 6.)

On the night of December 20, 2017, Quintero was detained
at the border while attempting to cross into the United States.
(11 RT 2077.) He was intoxicated (12 RT 2270-2271, 2323-2324)
and had superficial facial injuries, which he said he got during a
fight in Mexico (11 RT 2080, 2085; 12 RT 2298-2299). While
Quintero was temporarily in a holding cell, a Border Patrol
officer observed Quintero rubbing his face against the concrete
wall, aggravating the existing injuries. (12 RT 2330-2331.)

---

[2] In addition, the police inadvertently failed to collect the portion
of the video from 4:12 a.m. to 5:12 a.m. (12 RT 2262-2266.)

*Defense case.* Quintero testified in his own defense. He drank alcohol even as a child and he had a family history of alcoholism. (12 RT 2409.) When he was drunk, he often became incoherent and said "crazy" things. (12 RT 2407-2408.) He began to have blackouts in 2015. (12 RT 2410.) By 2017, Quintero was drinking heavily and had been an alcoholic for 10 years. (12 RT 2406-2407, 2413-2414.)

He became depressed when, in 2017, he lost his job and his romantic partner due to his alcoholism, his son began to visit him less frequently, and a close friend died. Quintero distanced himself from his friends. (12 RT 2410-2411.) He found a job as a truck driver. At one point, he injured his back and was prescribed painkillers (naproxen) and muscle relaxants. (12 RT 2412-2413.)

Quintero did not remember checking into the Big 7 Motel on December 15. (12 RT 2415.) On December 16, his estranged wife picked him up at the motel to visit his cousin, who recently had a baby. (12 RT 2415-2416; 13 RT 2647, 2649.) He drank a bottle of rum before she picked him up, and he drank heavily that night at his cousin's house. (12 RT 2416-2419; 13 RT 2651.)

After midnight, Quintero's estranged wife drove him back to the motel and dropped him off. (12 RT 2419-2420; 13 RT 2654.) She testified that he was "very drunk" and "talking nonsense." (13 RT 2652, 2654; 14 RT 2726.) He drove his own car to a nearby Walmart to buy more alcohol. (12 RT 2420; 13 RT 2654-2655.) When Quintero returned to the motel, he encountered two men, and the three of them walked to a nearby

liquor store to buy alcohol and cigarettes. (12 RT 2422-2424.)
Quintero returned to his motel room and fell asleep after he took
his prescribed muscle relaxants, pain killers, and anti-anxiety
medication. (12 RT 2424.)

Quintero's memory of subsequent events was hazy and
fragmented. His first memory was of finding himself on the
sidewalk in front of the motel drinking wine from a bottle. (12
RT 2425.) He noticed two men standing by the building that
housed the tattoo shop. (12 RT 2425, 2427.) He thought they
might be Jose and Garcia. (12 RT 2427.) Quintero walked over
and realized one of the men was Jesus. He did not remember his
conversation with Jesus. (12 RT 2427.)

Quintero's next memory was that he was on his back on the
sidewalk, bleeding, barefoot, and naked from the waist up. His
bottle of wine was on the ground. (12 RT 2428.) As he was
looking for his clothes, someone came out of the building and
struck his face and upper torso. (12 RT 2429.) After that,
Quintero picked up his sweater and sandals. (12 RT 2430.)

His next memory was of someone – Quintero does not know
who – running toward him from the direction of the Big 7 Motel.
(12 RT 2430.) Jesus was standing in the open doorway saying
something. (12 RT 2430-2431.) Thinking that he was going to
get beat up again, Quintero decided to fight Jesus because he was
closer than the other man. (12 RT 2431.) As Quintero and Jesus
approached each other, the other man grabbed Jesus. (12 RT
2432.)

The man screamed that Jesus had stabbed him, although Quintero did not see a knife or blood. (12 RT 2432.) Jesus tried to drag the man inside the building. (12 RT 2432.) Quintero pulled the man away from Jesus and then pushed Jesus back toward the building. They landed on the interior stairs with Quintero on top of Jesus. (12 RT 2433.) Jesus tried to push him off while Quintero tried to hold him. (12 RT 2433.) Quintero did not know what the other man was doing. (12 RT 2433.)

Quintero's next memory was of Jesus handing Quintero a phone. Quintero spoke with Jose and told him that Jesus had beat him up. (12 RT 2433-2434.) The man whom Jesus had earlier stabbed said there was someone else outside. (12 RT 2434.) Jesus screamed, "Get him. Get him." and then punched or kicked Quintero and attacked the man. (12 RT 2434-2435.) Quintero, who saw another person standing outside the building, ran up the stairs to look for a way out the back, but never found one. (12 RT 2435, 2437.) At this point, Jesus and the man who was stabbed were fighting at the top of the stairs. (12 RT 2436.) Quintero believed that Jose called him on the phone. Quintero again told Jose that Jesus had beat him up. (12 RT 2438.) Jose said he had $5,000 and was going to come over the shop. (12 RT 2438-2439.)

Quintero was getting ready to leave, but the unnamed man warned him there were "people out there." (12 RT 2440.) Jesus was unconscious on the floor. (12 RT 2440-2441.) Quintero next remembered Jesus grabbing or hitting him. (12 RT 2441-2442.) The man pulled Jesus off Quintero, who ran out of the building.

(12 RT 2442.)  Quintero had been in the building for 15 minutes.
(12 RT 2442.)  He did not know that Jesus was dead.  (12 RT
2455.)

Quintero returned to his motel room, grabbed his
belongings, and put them in his car.  (12 RT 2242.)  As he was
pulling away, the unnamed man jumped into the car and said,
"Go, go, go."  (12 RT 2443-2444.)  Quintero drove to Tijuana,
where he got a hotel room, used cocaine, and went out drinking
with the man until he ran out of money.  (12 RT 2446-2451.)
Later, he went to the home of a woman who is the mother of two
of his children, and he stayed there for a couple of days.  (12 RT
2453-2454.)

Quintero then drove to the Otay Mesa port of entry.  (12 RT
2454.)  He was drunk and got into a fight with another motorist.
(12 RT 2454-2456.)  He was detained at the border, but did not
remember speaking with Chula Vista police, whom the Border
Patrol had contacted.  He also did not remember how he got
home.  (12 RT 2456-2457.)

While pending trial, Quintero successfully moved to
represent himself.  (1 RT 139.)  While he was representing
himself, Quintero wrote a nine-page letter to law enforcement
about what happened on the night of Jesus's death, and he met
with detectives and later the prosecutor.  (12 RT 2357-2359; 13
RT 2508.)  During the cross-examination of Quintero, the
prosecution used the letter and Quintero's statements to the
prosecutor to highlight several material inconsistencies with
Quintero's testimony.  (13 RT 2511-2513, 2536-2537, 2541-2543,

2557-2571, 2573-2585.) Quintero acknowledged that he did not tell detectives or the prosecutor about the intermittent alcohol-induced blackouts he suffered from drinking on the night of the homicide. (13 RT 2530-2531.) He admitted that the photos he sent Garcia were faked and did not show actual injuries to his face. (13 RT 2608.)

A physician, Dr. Ryan Cooper, testified about the effects of alcohol, particularly that heavy drinking may interfere with the formation of long-term memories. (14 RT 2765-2768, 2775-2776.) He told jurors that a person experiencing a blackout can perform basic functions, such as driving a car, making phone calls, or navigating websites, but will not remember his actions. (14 RT 2776.) He explained that automatism was a phenomenon where a person could perform complicated functions, such as driving, but not be aware of or have any memory of performing the tasks. (14 RT 2778.) It can occur contemporaneously with an alcohol blackout. (14 RT 2778.) The memory loss can be fragmentary, and a person suffering memory loss unconsciously will try to fill the gaps with plausible guesses or information obtained from other sources. (14 RT 2779-2780.)

Dr. Lynette Rivers, a clinical and forensic psychologist, also explained fragmentary blackouts and testified that during blackout periods some people act as if they are functioning normally. (14 RT 2803-2804.) Confabulation – the effort to fill in memory gaps – may be based on things a person has heard or read. (14 RT 2810.)

ARGUMENT

I.   **The convictions must be reversed because the trial court failed to exercise its discretion when it denied Quintero's request for advisory counsel.**

While Quintero was representing himself, he asked the court to appoint counsel to assist him. (2 RT 309-310.) The trial court summarily denied his request, stating, "We don't do co-counsel here. I don't do that. We can have someone represent you, but in this circumstance, I would not be doing co-counsel or advisory counsel." (2A SRT 228.) In so ruling, the trial court failed to exercise its discretion and thus abused its discretion. Further, because it would have been an abuse of discretion to deny Quintero's request had the court exercised its discretion, the conviction is reversible per se. (*People v. Bigelow* (1984) 37 Cal.3d 731, 744.)

### A.   Factual and procedural background.

On February 15, 2019, the court granted Quintero's request to represent himself. (1 SCT 5-7 [signed *Faretta* form]; 1 RT 139-140.) The *Faretta* form included the statement, "I understand that I do not have a right to advisory, standby or co-counsel." (1 SCT 7.)

On April 22, Quintero asked the court to appoint counsel to assist him:

> Quintero:   I do want to ask the Court for a court counsel that is not affiliated with OAC [Office of Assigned Counsel].
>
> Court:      Well, you want me to reappoint the public defender?

Quintero:    No. I have a conflict of interest with the public defender on my last hearing on the *Faretta* hearing. . . .

Court:       . . . What exactly are you asking me to do?

Quintero:    I need for the Court to assign me co-counsel that is not affiliated with OAC, because OAC makes me sign a contract waiving my rights, and I don't agree with the contract with OAC waiving my rights.

Court:       Okay. Mr. Quintero, you are going to either represent yourself or I will appoint the public defender or the alternate public defender, but I'm not appointing co-counsel. You can either be your own attorney or you can be represented by an attorney. I'm not going to appoint co-counsel. [¶] So are you asking me to revoke your pro per status and appoint an attorney to represent you?

Quintero:    I believe in the interest of justice it would be better to have a co-counsel so that this moves on faster. And if you say that I'm not having a co-counsel, I'll stay as pro per. But the time it's going to take me —

Court:       I don't want to tell you what to do. We had this conversation. I told you what I think about someone in your shoes, with a murder charge, representing themselves. I already told you it's not a wise idea. But there is no such thing as co-counsel. It's either you're on your own in pro per or I assign you an attorney and you can assist that attorney. That attorney has obligations towards you. But there is no co-counsel. So if you want to continue to represent yourself sitting next to an attorney, that is not going to

> happen. It is either you're on your own or
> you're represented. What is your choice?

Quintero:   I'll stay on my own.

(2 RT 309-310.)

On May 1, at the end of an ex parte hearing about
Quintero's complaints regarding ancillary services he was
receiving, Quintero again asked the court to appoint counsel, and
the court again summarily denied the request.

> Quintero:   Due to my limitations as a KSA inmate
> ["Keep Separate All," a type of restrictive
> protective custody], is it possible so that I
> have full access with the board of lawyers
> to cross-examine for the court to a [*sic*]
> assign me a co-counsel? That way all the
> motions that establish my defense, I can
> send that straight to that co-counsel.

> Court:   We don't do co-counsel here. I don't do
> that. We can have someone represent
> you, but in this circumstance, I would not
> be doing co-counsel or advisory counsel.

(2A SRT 228.)

On May 20, 2019, Quintero moved to relinquish his pro per
status. (3 RT 503.) The court granted the motion and
reappointed the public defender's office. (3 RT 506.)

**B.   Quintero timely requested advisory counsel.**

More than a year before trial, Quintero asked the court to
appoint "court counsel" and "co-counsel." (3 RT 309; 2A SRT
228.) In context, he meant that he wanted the appointment of
advisory counsel, i.e., an attorney who would provide legal advice
but would not speak for him or participate in court proceedings.
(See *Chaleff v. Superior Court* (1977) 69 Cal.App.3d 721, 731, fn.
6 (conc. opn. of Hanson, J.).) Quintero was asking for assistance

and not asking to share control and responsibility for his defense. For example, Quintero explained to the court that he wanted the assistance of counsel because of "the time it's going to take me" and "so that this moves on faster" (2 RT 310) and so that "all the motions that establish my defense, I can send that straight to that co-counsel," who could file them without running into the obstacles Quintero felt he was having with OAC. (2A SRT 228.)

That Quintero used the terms "court counsel" and "co-counsel" does not show he wanted a co-counsel rather than an advisory counsel appointed. That is because the substance of his request, not the label he used, is controlling in understanding his request. (See *O&C Creditors Group, LLC v. Stephens & Stephens XII, LLC* (2019) 42 Cal.App.5th 546, 560 [courts "do not find labels to be dispositive and instead look at the substance of the motion"]; Civ. Code, § 3528 ["The law respects form less than substance."].) Quintero used the terms "court counsel" and "co-counsel" imprecisely, but the terms "advisory counsel," "standby counsel," and "co-counsel" are closely related and even courts have used them loosely. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14.) Here, the reasons Quintero offered for appointment of counsel show that he wanted advisory counsel.

Moreover, the record shows that the trial court understood that Quintero was asking for advisory counsel because it expressly said it would not appoint advisory counsel. When it denied the request a second time, the court stated, "I would not be doing co-counsel or advisory counsel." (2A SRT 228.) This is sufficient to show that Quintero brought to the court's attention

the nature of his request, namely, that he wanted advisory counsel to assist him.  (Cf. *People v. Scott* (1978) 21 Cal.3d 284, 290 ["An objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide.  In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented."], citations omitted; *People v. Frank* (1985) 38 Cal.3d 711, 738 ["if the trial court considered and ruled on the issue as if an objection had been properly made, appellate review is permitted"].)

## C. The trial court abused its discretion because it failed to exercise its discretion when it summarily denied Quintero's request for advisory counsel.

A trial court has discretion to appoint advisory counsel to "assist an indigent defendant who elects self-representation" (*People v. Crandell* (1988) 46 Cal.3d 833, 861) and to "promote orderly, prompt and just disposition of the cause" (*People v. Mattson* (1959) 51 Cal.2d 777, 797).

A court ruling on a motion abuses its discretion if it is unaware of its discretionary power or if it bases its ruling on a blanket policy or practice.  (*People v. Gutierrez* (2014) 558 Cal.4th 1354, 1391 [a court that "is unaware of the scope of its discretionary powers" has not exercised "informed discretion"], quoting *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8; *People v. Burton* (1989) 48 Cal.3d 843, 853 [a court must exercise its discretion based on its consideration of the relevant factors].) "This is so "even though there may be substantial evidence to

support that order." (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 16, citing *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436.)

*People v. Crandell, supra,* 46 Cal.3d. 833 illustrates the court's obligation to eschew a blanket policy and instead to exercise its discretion when ruling on a request for advisory counsel. In that case, the defendant twice requested the appointment of advisory counsel. (*Id.* at pp. 855-858.) The trial court summarily denied the requests. The California Supreme Court held that the trial court failed to exercise its discretion and thus abused its discretion:

> These requests were summarily denied. On one
> occasion, when told of defendant's request for
> advisory counsel, the court stated: "No, there is no
> such thing." On another occasion, when informed the
> public defender's office would not accept appointment
> in an advisory capacity, the court stated: "I wouldn't
> appoint that kind of counsel anyway." None of the
> judges who considered the matter expressly
> acknowledged the existence of discretion to appoint
> advisory counsel for defendant, and there is no
> evidence that any judge engaged in a reasoned
> exercise of judgment based on an examination of the
> particular circumstances of this case. The failure to
> exercise discretion was error. (*People v. Bigelow,
> supra,* 37 Cal.3d at p. 743.)

(*Id.* at p. 862; see also *People v. Choi* (2021) 59 Cal.App.5th 753, 766-767 [applying a blanket practice or policy to deny appointment of advisory counsel would be an abuse of discretion].)

Here, as in *Crandell,* the trial court did not acknowledge that it had or was exercising discretion to appoint advisory counsel. Nor does the record show that the court considered any

relevant facts that a reasoned exercise of judgment would require. On the contrary, the court said, "We don't do co-counsel here. I don't do that. We can have someone represent you, but in this circumstance, I would not be doing co-counsel or advisory counsel." (2A SRT 228.) The court presented the issue as a binary choice that did not include the appointment of advisory counsel. "It's either you're on your own in pro per or I assign you an attorney and you can assist that attorney. . . . So if you want to continue to represent yourself sitting next to an attorney, that is not going to happen. It is either you're on your own or you're represented." (2 RT 310.) The court's statements reflected a blanket rule that foreclosed "an examination of the particular circumstances" of the case that reasoned exercise of judgment requires. (*Crandell, supra*, 46 Cal.3d. at p. 862.)

Even if it can be discerned from the colloquy with Quintero that the court knew it had the discretion to grant Quintero's request, its statements betray a rigidity reflecting a practice of never providing advisory counsel to a pro. per. defendant or, at best, a summary denial of Quintero's request in this case. In either event, the court's comments demonstrate its failure to engage in a reasoned exercise of its discretion. (*In re Cortez* (1971) 6 Cal.3d 78, 85-86 ["To exercise the power of judicial discretion all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision."].)

By failing to exercise discretion, the court abused its discretion.

### D.   Because it would have been an abuse of discretion to deny Quintero's request for advisory counsel, the convictions are reversible per se.

When a trial court fails to exercise its discretion in denying

a request for advisory counsel, the reviewing court must

determine whether, had the trial court exercised its discretion,

refusing the request would have been an abuse of discretion.  If

the denial would have been an abuse of discretion, the error is

reversible per se. (*Bigelow, supra,* 37 Cal.3d at p. 744.)  If, on the

other hand, the denial would not have been an abuse of

discretion, the trial court's error is reviewed for prejudice under

*People v. Watson* (1956) 46 Cal.2d 818.  (*Crandell, supra,* 46

Cal.3d at pp. 864-865.).  Here, even if the trial court had

exercised its discretion in ruling on Quintero's request for

advisory counsel, it would have been an abuse of discretion to

deny that request.  For that reason, the convictions are reversible

per se.

A trial court should appoint advisory counsel when the

defendant makes a substantial showing that "the cause of justice

will thereby be served and that the orderly and expeditious

conduct of the court's business will not thereby be substantially

hindered, hampered or delayed." (*Mattson, supra,* 51 Cal.2d at p.

797.)  The Supreme Court identified the following factors to

determine whether a trial court would have abused its discretion

in denying the defendant's request for appointment of advisory

counsel: the seriousness of the charges; the factual and legal

complexity of the case; the defendant's general education, legal

knowledge, and demonstrated legal abilities; and any evidence

that the request for advisory counsel reflected a manipulative purpose. (*Bigelow, supra*, 37 Cal.3d at pp. 743-744; *Crandell, supra*, 46 Cal.3d at pp. 863-864.) These factors reflect the need, in certain cases, to appoint advisory counsel to "assist an indigent defendant" exercising his Sixth Amendment right to represent himself (*Crandell, supra*, 46 Cal.3d at p. 861) and simultaneously to "promote orderly, prompt and just disposition of the cause" (*Bigelow, supra*, 37 Cal.3d at p. 742, quoting *Mattson, supra*, 51 Cal.2d at p. 797 and emphasis added).

Here, consideration of the foregoing factors compels the conclusion that it would have been an abuse of discretion to deny Quintero's request for advisory counsel.

### 1. The charges were extremely serious.

The charges against Quintero – murder, torture, and kidnapping for ransom or extortion – were extremely serious. In addition, the indictment alleged kidnapping and torture special circumstances, which, if found true, required an LWOP sentence at a minimum and made Quintero eligible for the death penalty. (1 CT 9-10.) On May 1, 2019, when the court denied the request for advisory counsel for a second time, it appears that Quintero still was facing the death penalty. (See 4A RT 742 [at a *Marsden* hearing on June 5, 2019, the court remarked that defense counsel was properly investigating mitigation evidence "to save you from the death penalty"].)

The charges were every bit as serious as the charges in *People v. Bigelow, supra*, where the defendant was charged with first degree murder, robbery, and kidnapping, along with firearm and special circumstances allegations. (37 Cal.3d at p. 737.)

### 2.    The case was legally and factually complex.

In *Bigelow*, the court found the case involved "complex additional legal and factual issues" in part because the recently enacted death penalty statute was "rife with constructional and constitutional difficulties" and "had not yet been judicially interpreted." (37 Cal.3d at p. 743.)

Quintero's case did not require the construction of recently enacted laws, but it was legally complex because of the number of charges and the multiple theories for each charge.  The prosecution's case for murder proceeded under three different theories – premeditated murder, felony murder, and torture-murder.  Moreover, there were two different underlying felonies for felony murder – kidnapping and burglary.  (2 CT 320.)  Each theory of murder had different elements, particularly different mental states.  (See, e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 244-245 [the mental state for torture murder is "a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose"]; *People v. Sandoval* (2015) 62 Cal.4th 394, 424 [the metal states for premeditated murder are intent to kill, deliberation, and premeditation]; *People v. Lewis* (2001) 25 Cal.4th 610, 642 [the mental state for felony murder is the specific intent to commit the underlying felony].)  The kidnapping charge required proof that Quintero had the intent to commit extortion or exact money from another person.  (Pen. Code, § 209, subd. (a).)  The special circumstance allegations (kidnapping and torture) required proof that Quintero was the actual killer or was

an aider and abettor who either had the intent to kill or was a major participant who acted with reckless disregard for human life. The last finding required the jury to undertake a multi-factor analysis about Quintero's actions and mental state. (See, e.g., *People v. Banks* (2015) 61 Cal.4th 788, 803; *People v. Clark* (2016) 63 Cal.4th 522, 619-622.)

The case also was factually complex. Quintero was present during the crime, but the evidence did not clearly establish his role in the incident. For example, in closing argument, the prosecutor conceded that another person was involved and said it was unclear if Quintero was the actual killer or an aider and abettor. (17 RT 3435.) Quintero's legal culpability also required assessment of the extent of his intoxication and its effect on his mental states for the offenses and special circumstance allegations. Further factual complexity arose from the extensive evidence of Quintero's post-homicide conduct, which was relevant to his mental state and credibility as a witness, and Jose's conduct in not coming to his brother's aid and later lying to police, which was relevant to his credibility as a witness. Thus, this case was unlike more typical cases involving the denial of advisory counsel where only one discrete issue was in dispute. (See *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1429 [where it was undisputed the defendant shot the two victims, the sole issue of intent "was not an overly complex matter – either legally or factually"]; *People v. James* (2011) 202 Cal.App.4th 323, 339 [where the sole issue was the identity of the robber, the case was not factually or legally complex].)

### 3.   Quintero had no legal knowledge, experience, or ability.

In *Bigelow*, there was no evidence that the defendant had any demonstrated legal abilities, and he apparently had only a minor criminal record and never represented himself. (See *Bigelow*, *supra*, 37 Cal.3d 744 ["Although he had been in court on several occasions, he had been represented by counsel on each occasion except once when he pled guilty to a minor offense."].) He was a naïf in the courtroom.

The defendant in *Crandell* was at the other end of the spectrum.

> Defendant appeared before the superior court as an obviously intelligent, literate, and articulate advocate in his own cause who had acquitted himself well at the preliminary hearing.  He had brought discovery and numerous other motions, had subpoenaed witnesses, and had engaged in skillful examination and cross-examination at the preliminary hearing. Defendant had demonstrated in his motion papers an ability to research the law, to cite applicable precedent, and to engage in reasoned argument.

(*Crandell*, *supra*, 46 Cal.3d. at p. 864.)

Quintero's experience with the criminal justice system, legal knowledge, and demonstrated legal abilities were like those of the defendant in *Bigelow* and utterly unlike the defendant's in *Crandell*.  Although he attended college (1 SCT 5; 1 RT 126-127), Quintero had no training in the law and never represented himself.  (1 RT 127.)  Before this case, Quintero had never been charged with a criminal offense.  (2 CT 380, 382 [probation report].)

Quintero was overwhelmed by the challenges of pretrial preparation and litigation while being incarcerated, and he tended to focus on irrelevant matters. Charged with a capital offense, he was kept in restrictive protective custody and only had access to the law library three hours per week. (2A SRT 217.) During a hearing at which he complained about the ancillary services he was receiving as a self-represented defendant, his arguments showed that he lacked even a rudimentary understanding of what was relevant to the defense of his case. (See 2A SRT 208 [the court describing Quintero's list of complaints as "mostly incoherent from my perspective in addressing things that would not, one, be addressed by this court, but also, two, likely not be any part of your criminal case"].)

>    **4.   There was no evidence that Quintero sought advisory counsel for manipulative purposes.**

The record is devoid of any evidence that Quintero requested advisory counsel for some manipulative purpose. In denying Quintero's request, the court did not even hint that it though Quintero was being manipulative.

>    **5.   Granting the request for advisory counsel would have advanced the twin goals of assisting Quintero in representing himself and of promoting the orderly, prompt, and just disposition of the case.**

The appointment of advisory counsel assists a defendant in exercising his Sixth Amendment right to represent himself and, at the same time, promotes the orderly, prompt and just disposition of the case. (*Crandell, supra*, 46 Cal.3d at p. 861; *v. Mattson, supra*, 51 Cal.2d at p. 797.) By denying Quintero's

request, the trial court ensured an orderly and prompt trial, but it undermined Quintero's Sixth Amendment right to self-representation and soon forced him to relinquish that right.

The right to self-representation "exists to affirm the dignity and autonomy of the accused." (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 176-177.) But granting self-representation will do little to affirm a defendant's dignity and autonomy, even if he meets *Faretta*'s minimal standards for self-representation, if he lacks the experience, knowledge, and capacity to prepare and litigate his defense in a legally and factually complex case involving the most serious criminal charges. (Cf. *Indiana v. Edwards* (2008) 554 U.S. 164, 176 ["a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel"].) It is in these circumstances that the appointment of advisory counsel is most warranted.

When it denied Quintero's request, the court repeatedly told Quintero that his only choices were to go it alone or be represented by counsel. "So if you want to continue to represent yourself sitting next to an attorney, that is not going to happen. It is either you're on your own or you're represented." (2 RT 310; see also 2 RT 310 ["You can either be your own attorney or you can be represented by an attorney. . . . So are you asking me to revoke your pro per status and appoint an attorney to represent you?" . . . It's either you're on your own in pro per or I assign you an attorney and you can assist that attorney."]; 2A SRT 228 ["We can have someone represent you, but in this circumstance, I

would not be doing co-counsel or advisory counsel."].)  The court's framing of Quintero's choices did not take account of the role advisory counsel could have played in assisting Quintero in exercising his constitutional right to represent himself in a legal and factually complex case involving very serious charges.

Nineteen days later, Quintero gave in and relinquished his pro per status.  (3 RT 503, 506.)  Denying Quintero's request for advisory counsel had the effect of compelling Quintero to give up his constitutional right to represent himself.  Although the reappointment of the public defender to represent Quintero for the rest of the proceedings ensured an orderly and prompt disposition of the case, it came at the cost of denying Quintero his constitutional right to represent himself.

* * * * *

Based on the *Bigelow/Crandell* factors, it would have been an abuse of discretion – had the court exercised its discretion – to deny Quintero's request for the appointment of advisory counsel. Accordingly, the trial court's failure to exercise its discretion was reversible per se.  (*Bigelow*, *supra*, 37 Cal.3d at p. 744.)

**E.    *Bigelow* is not limited to capital cases.**

Several courts have applied *Bigelow* in non-capital cases where the defendant timely requested advisory counsel.  (See, e.g., *People v. Choi*, *supra*, 59 Cal.App.5th at pp. 766-769 [stalking]; *People v. Debouver* (2016) 1 Cal.App.5th 972, 976-977 [first-degree burglary]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 554-555 [multiple robberies].)

In *People v. Garcia*, *supra*, 78 Cal.App.4th 1422, this court declined to apply *Bigelow* in a non-capital murder case.  The pro

per defendant was convicted of first-degree murder and premeditated attempted murder. (*Id.* at pp. 1424-1425.) Although the defendant did not request advisory counsel in the trial court, he argued on appeal that the trial court had a sua sponte duty to appoint one. (See *id.* at p. 1432 (conc. opn. of Huffman, J.).) This court held that *Bigelow* did not apply, stating: "We are unwilling, without specific direction from our Supreme Court, to extend *Bigelow* to the instant noncapital case." (*Id.* at p. 1429; see also *id.* at p. 1432 [the concurring opinion agreeing with this statement].) The majority reasoned that any other rule would "entirely eviscerate[]" the rule that a defendant who represents himself cannot later claim ineffective assistance of counsel. (*Id.* at p. 1430.) This court also stated, "we respectfully disagree with the portion of the *Bigelow* opinion that goes beyond confirming the right of courts to appoint advisory counsel and holds that a trial court can abuse its discretion in *failing* to do so." (*Id.* at pp. 1429-1430, emphasis in original.)

Despite the potentially broad language in *Garcia*, this court's holding seems to be limited to the particular circumstances of the case. The court first noted that the facts were not in dispute; the defendant shot and killed one victim at close range and then chased another victim and shot him in the back. "The only issue was his intent, which was not an overly complex matter – either legally or factually." (*Id.* at p. 1429.) The court then stated *Bigelow* should not be extended to all cases deemed serious where the defendant did not make a timely request for assistance:

> Moreover, to hold in this case that the court abused
> its discretion in failing to appoint advisory counsel
> absent a request for one, would result in a rule that
> courts have a sua sponte duty to appoint advisory
> counsel in all murder or very serious cases (or even
> less serious cases depending on where the line is
> drawn) involving an unsophisticated defendant, who
> nevertheless wishes to represent himself. We are
> opposed to creating such a rule.

(*Id.* at p. 1429.) Thus, by its own terms, the *Garcia* holding, that

the trial court did not abuse it discretion in failing to appoint

advisory counsel, is limited to non-complex cases in which the

defendant did not timely request advisory counsel. (See also

*People v. Harrison* (2013) 215 Cal.App.4th 647, 656 [citing *Garcia*

for the proposition that a trial court has no obligation to appoint

advisory counsel sua sponte].)

This court should limit the *Garcia* holding to the

circumstances of that case and not read *Bigelow* to apply only to

capital cases. The fact that the defendant in *Bigelow* was

charged with a capital offense informed the Supreme Court's

assessment of the factors that would compel appointment of

advisory counsel – namely, the seriousness of the charges and

complexity of the legal and factual issues presented. (See

*Bigelow, supra,* 37 Cal.3d at p. 743.) But the *Bigelow* court did

not limit its holding to capital cases even though it easily could

have done so. Nor did the high court do so when it revisited

*Bigelow* in *Crandell.*

There is no reason for such a limitation. Very few

defendants represent themselves, and even fewer timely seek the

appointment of advisory counsel. For those few defendants who

request advisory counsel, the *Bigelow* factors – particularly the seriousness of the charges, the factual and legal complexity of the case, and the defendant's demonstrated legal abilities – substantially limit the cases for which advisory counsel must be appointed.

Proper application of the *Bigelow* factors to serious, complex cases in which the defendant timely requested assistance will not eviscerate the rule that a defendant representing himself cannot claim ineffective assistance of counsel. Rather, it will protect a defendant's Sixth Amendment right to represent himself in both capital and non-capital cases. The U.S. Supreme Court stated that the constitutional right of self-representation grows out of "'that respect for the individual which is the lifeblood of the law.'" (*Faretta v. California* (1975) 422 U.S. 806, 834, quoting *Illinois v. Allen* (1970) 397 U.S. 337, 350-351 (conc. opn. of Brennan, J.).) However, in a legally or factually complex case involving serious charges, denying a defendant advisory counsel risks making a mockery of justice by turning the proceedings into a charade that demeans the defendant rather than respects his constitutionally guaranteed autonomy. The California Supreme Court has admonished courts to "interpret *Faretta* in a reasonable fashion to vindicate the legitimate rights of defendants while at the same time avoiding turning the trial into a charade." (*People v. Clark* (1992) 3 Cal.4th 41, 116.) This is because the state "has a strong interest in the accuracy and fairness of all its criminal proceedings." (*People v. Chadd* (1981) 28 Cal.3d 739, 753.) In non-capital cases,

as well as capital cases, application of the *Bigelow* factors will accommodate the state's and the defendant's interests without imposing an undue burden on the courts.

## II.   The minutes and abstract should be corrected to delete the criminal justice administrative fee.

On September 16, 2020, the court imposed a criminal justice administrative fee of $154.  (2 CT 460 [minutes]; 2 CT 389 [abstract]; 20 RT 3728.)

Two days later, the governor signed AB No. 1869, which eliminated a variety of fees in criminal cases, including the criminal justice administrative fees mandated by Government Code sections 29950, 29950.1, 29950.2 and 29950.3.  (See Stats. 2020, ch. 92, § 11.)  The new enactment provides, inter alia, that "any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).)  Section 6111 became effective on July 1, 2021.  (Gov. Code, § 6111, subd. (b).)  In the uncodified portion of AB No. 1869, the Legislature declared, "It is the intent of the Legislature . . . to eliminate all outstanding debt incurred as a result of the imposition of administrative fees." (See Stats. 2020, ch. 92, § 2.)

The plain language of the statute and the stated legislative intent require this court to vacate the portion of the judgment imposing the criminal justice administrative fee.  Accordingly, this court should order the minutes and abstract corrected to delete the criminal justice administrative fee.

CONCLUSION

For the foregoing reasons, this court should reverse the convictions. Alternatively, this court should order the minutes and abstract corrected to delete the criminal justice administrative fee.

DATED: July 26, 2021

Respectfully submitted,

_____/s/_____

John P. Dwyer
Attorney for Appellant
DANIEL RODRIGUEZ QUINTERO

# EXHIBIT B



Filed 5/11/22  P. v. Quintero CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077996 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS303737) |
| DANIEL RODRIGUEZ QUINTERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Francis Devaney, Michael T. Smyth, and Timothy Walsh, Judges. Affirmed as modified.

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and James M. Toohey, Deputy Attorneys General for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Daniel Rodriguez Quintero of first degree murder with the special circumstances of torture and kidnapping for ransom. Early in the case, Quintero asked to represent himself. The trial court granted his *Faretta*[1] motion and appointed the Office of Assigned Counsel (OAC) "to provide a legal runner and reasonable ancillary services." Quintero later raised concerns about the efficiency of OAC and, on two separate occasions, requested the appointment of "co-counsel" other than OAC or the public defender. The trial court denied both requests and, approximately three weeks later, Quintero relinquished his pro per status. He was represented by a public defender at trial.

On appeal, Quintero contends the trial court failed to exercise its discretion to appoint "advisory counsel"[2] and, instead, summarily denied his request as a matter of practice. He further contends the error is reversible per se because it would have been an abuse of discretion to deny the request had the trial court exercised its discretion. The Attorney General contends Quintero forfeited this claim by relinquishing his pro per status, the trial court did not fail to exercise its discretion, and, even if it did, the error was not prejudicial.

---

[1]    *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[2]    Quintero asked the trial court to appoint "co-counsel," but on appeal he asserts the trial court erred by failing to appoint "advisory counsel." In response to Quintero's request, the trial court stated it would not appoint co-counsel or advisory counsel. Except when referencing the exact language Quintero used in the trial court, we refer to his request as a request for advisory counsel.

We reach the merits of Quintero's claim, but conclude the trial court did not fail to exercise its discretion and, even assuming so, any error does not require reversal.  Quintero also asks us to vacate any unpaid portion of the $154 criminal justice administration fee imposed under the recently repealed Government Code section 29550.1.  We shall modify the judgment to vacate any unpaid portion of that fee as of July 1, 2021, and affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Trial*

A.   *Prosecution's Case*

Jesus Q. co-owned a tattoo shop and ran a T-shirt business with his brother, Jose Q., from the bottom floor of the shop.[3]  The brothers also sold drugs and Jesus was known to use cocaine.

At about 8:30 p.m. on December 16, 2017, Jose saw Jesus at the tattoo shop when he went to unload some shirts at his T-shirt shop.  Jesus helped Jose unload the shirts and Jose left about half an hour later.  Jesus was alone when Jose left, but he later texted Jose and told him he was drinking with a friend at the tattoo shop.  The friend left the shop at approximately 3:00 in the morning on December 17.

Jesus called Jose around the same time to tell him Quintero was outside the tattoo shop.  Jose told Jesus to go inside and lock the door.  Jesus told Jose he would call him back.  When Jesus failed to call, Jose tried to call him.  Jesus answered and Jose could hear people arguing.  Jose asked to

---

[3]   Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the victim and witnesses by their first name and last initial, and then by their first names only.

speak to Quintero and asked him, "What's going on?" Quintero said: "Well, somebody owes me money. Somebody owes me a million dollars." Quintero then explained, "Ramon owes me money," that he could not get ahold of Ramon, and thought Jose or Jesus could because they were "closer" and "get along" better with Ramon.[4] Quintero hung up the phone.

Jose tried calling his brother back, but no one answered. Jose then reached Quintero through a Facebook call. When Quintero answered, Jose heard talking and "some sort of scuffle" in the background. He heard Jesus say: "You guys already hit me. You know, you guys already did what you did. You know, you guys already hit me and, you know, that's it. You know, let's just call that it." Jose believed his brother was "begging for his life." Quintero then told Jose, "[i]f you hang [up] the phone, you call the cops, I'm going to kill your brother." Jose heard the voice of at least one other person talking in the background and, at one point, Quintero told Jose, in a quieter, softer voice, "because they're trying to kill me and my family."

Quintero continued to demand money but changed the amount from a million dollars to $5,000. When Jose told him he had $2,000 at home, Quintero responded: "So that's what your brother's worth? $2,000? You think this the first time I do this?" Jose said he would need to make some calls to get more money, and Quintero agreed to let him hang up the phone to call Ramon. When Jose called Ramon, Ramon told him that he did not owe Quintero any money. Ramon refused to go to the tattoo shop but agreed to call Quintero. Quintero then told Ramon to stay out of it because "the problem was not with [him]."

---

4    This was a reference to a mutual acquaintance, Ramon G.

Jose began calling others, including Jesus's former girlfriend, Christina R., who agreed to call the police. Meanwhile, Jose drove to the tattoo shop. He arrived at about 6:30 a.m., parked across the street, and waited to see if there was any movement. He did not see any movement, so he left to meet Christina at a restaurant down the street from the tattoo shop and gave her the building key to give to the police.

At around noon, the police entered the tattoo shop in tactical gear. They found blood on the wall, tile, and stairs in the entryway. Jesus's body was lying on the floor at the top of the stairs. He was naked from the waist down, his legs were wrapped with an electrical cord, and his ankles were wrapped tightly with shoelaces. The police did not locate any other individuals inside the building.

The medical examiner testified Jesus died from "blunt head and neck trauma," and possible "mechanisms" of death included blunt force to the head and neck, and strangulation. Jesus had extensive injuries throughout his body, including blunt force trauma to the head, neck (including fractures to the hyoid bone), torso, and both his upper and lower extremities. He had a small skull base fracture, bruising and bleeding around and on the brain. His nose was broken, and he had bruising and lacerations near his eyes. The manner of death was homicide.

Forensic evidence established Quintero's presence at the scene of the murder. Quintero's fingerprints were on a beer bottle and tequila bottle in the tattoo shop. His fingerprints on the tequila bottle were in blood and DNA testing established it was Jesus's blood. There were shoe impressions with a distinctive tread pattern left on the floor of the tattoo shop, which were forensically matched to Quintero's sandals later seized during a search of his apartment. Cell phone tower data placed Quintero's phone in the vicinity of

5

the tattoo shop at the time of the murder; the phone was used for two voice calls, at approximately 2:35 a.m. and 3:24 a.m. The police collected fingerprints belonging to several other individuals, but did not determine who else, if anyone, was at the shop with Quintero at the time of the murder.

Quintero was detained on December 20, 2017, while crossing the border from Mexico into the United States. A detective asked Quintero if he had any knowledge about what happened at the tattoo shop. He initially denied having any information, but later said it involved the D.E.A. (Drug Enforcement Agency). Quintero was released but the police seized his phone and impounded his car. During a warrant search executed at Quintero's apartment later that week, police collected the sandals Quintero wore when he was detained at the border and which matched the shoe impressions left at the murder scene.

B.   *Defense Case*

Quintero testified in his own defense. He admitted he was at the tattoo shop and stayed at a nearby motel the night of Jesus's murder. He admitted his fingerprint, imprinted in Jesus's blood, was on the tequila bottle in the shop. And he acknowledged the sandals seized from him by law enforcement were the sandals he wore on the night of the murder.

Quintero testified, however, he was an alcoholic and was taking prescription muscle relaxers the week of the murder. As a result, he had frequent blackouts and a limited recollection of the days surrounding the murder. Quintero knew Jesus and Jose, and knew Jesus was co-owner of the tattoo shop. He had been staying at a motel near the tattoo shop on the night of the murder, but had no recollection of checking into the motel.

He left the motel to go to a party with his ex-wife on December 16, 2017. He drank heavily at the party, and his ex-wife dropped him off at the

6

motel sometime after dark. He went to the store to buy more alcohol, but it was closed. When he returned to the motel two men in the parking lot told him the 7-Eleven was open, so he walked there and purchased two bottles of wine. When he got back, he took his muscle relaxers and fell asleep.

The next thing Quintero remembered was drinking on the sidewalk in front of the motel. He did not know how long he had been there, or how long he had slept. He saw two men standing outside the tattoo shop. He walked towards them and recognized one as Jesus. He did not know the other man.

Quintero's next memory was lying on the sidewalk in front of the tattoo shop, alone and bleeding. He did not have a shirt on and recalled being hit again when he stood up to look for it. He saw Jesus standing in the doorway of the shop and saw another man running towards him. He thought he was going to get beat up again, so he started fighting with Jesus. The other man tackled Jesus and started screaming, saying Jesus had stabbed him. Quintero pulled the man off Jesus, and Quintero and Jesus fell onto the stairs inside the tattoo shop.

Jesus handed Quintero a phone. Quintero recalled talking to Jose on the phone, but the only detail of the conversation he could recall was telling Jose that Jesus beat him up. Jesus kicked or punched Quintero, causing him to hit his head. Then, Jesus and the other man began to fight again. Quintero did not recall what happened to Jesus's phone, but did recall Jose calling him back on his own phone and asking what was going on. He also remembered Jose saying he had $5,000 and that he was going to come to the shop.

Quintero's next memory was the other man telling him not to go outside because there were people out there. Jesus was unconscious on the landing of the stairs. Quintero next recalled Jesus grabbing him, although he

was not sure of the exact sequence of events. The other man pulled Jesus off Quintero and Quintero ran out of the tattoo shop and back to his motel room. Quintero had been in the building for 15 minutes. When he left, he did not know that Jesus was dead.

Quintero had told Jose where he was staying and was concerned Jose would come after him, so he got in his car to leave. As he was leaving, a man ran up to the car and got in on the passenger side. Quintero did not recognize the man but believed it was the same man that had been at the tattoo shop. The man said "Go, go, go," and Quintero started driving. Quintero's next memory was the man waking him up. Quintero was still driving but had stopped, and presumably fallen asleep, at a stoplight. He was on the phone with Ramon and the person in the car was asking, "Is he here with the money?" Quintero then drove to Mexico. He and the man checked into a motel, Quintero consumed some cocaine, and he and the other man went drinking at a club until Quintero ran out of money.

Quintero tried to cross back into the United States a few days later to go to work. He was drunk, hit another car while waiting in line at the border, and got into a fist fight with the other driver. Quintero was detained at the border and arrested a few days later.

On cross-examination, Quintero acknowledged writing a letter to law enforcement in March 2019, describing what happened on the evening of the murder. He conceded his prior statement was "very different" from his trial testimony. He explained the differences by saying he "filled in all the gaps in [his] memory" with "the police report and the transcripts," "what somebody angry would do at the time," and his "imagination."

Quintero's ex-wife also testified. She confirmed Quintero was drinking a lot at the party on December 16, 2017. She decided it was time to leave the

party around midnight and dropped Quintero off at the motel on her way home. Quintero was "very drunk."

The defense also called an emergency room physician and a psychologist as expert witnesses. Each testified about the effects of alcohol on memory, behavior, and judgment. Both discussed blackouts and confabulation, a phenomenon in which alcoholics try to make sense of what happened by filling in memory gaps caused by fragmentary blackouts.

During closing arguments, defense counsel asserted Quintero was guilty of manslaughter, but not murder. She argued the prosecution had not proven intent, in part because the evidence showed Quintero was extremely intoxicated.

C.    *Verdict and Sentencing*

The jury convicted Quintero on all charged counts: first degree murder (Pen. Code,[5] § 187, subd. (a); count 1); kidnapping for ransom (§ 209, subd. (a); count 2); and torture (§ 206; count 3). As to the murder charge, the jury found two special circumstances to be true—murder in the commission of a kidnapping (§ 190.2, subd. (a)(17)) and intentional murder with infliction of torture (§ 190.2, subd. (a)(18)). As to the kidnapping charge, the jury found the special allegations that the victim suffered bodily harm and death and was intentionally confined in a manner which exposed him to a substantial likelihood of death to be true.

The trial court sentenced Quintero to prison for life without the possibility of parole on each of the murder kidnapping convictions, and life in prison on the torture conviction. As to the sentences on the kidnapping and torture convictions, the court stayed them pursuant to section 654. The court

---

5    Further unspecified statutory references are to the Penal Code.

also imposed various fines and fees, including a $154 criminal justice administration fee pursuant to now-repealed Government Code section 29550.1.

## DISCUSSION

### I.

*The Trial Court Did Not Abuse Its Discretion By Denying Quintero's Request for Advisory Counsel*

Quintero asserts the trial court failed to exercise its discretion when it denied his request for advisory counsel, during a brief period in which he was representing himself in pro per. He further contends the error requires reversal per se because it would have been an abuse of discretion to deny the request if the trial court had exercised its discretion. The Attorney General contends Quintero forfeited the argument by relinquishing his right to represent himself and accepting appointed counsel. We decline to resolve the issue based on forfeiture, but conclude the trial court did not fail to exercise its discretion and, even if it did, the error was not prejudicial.

A.   *Relevant Pre-Trial Proceedings*

Quintero was initially represented by the San Diego County Public Defender Office. He asked to represent himself in February 2019, relatively early in the proceedings. He explained to Judge Francis Devaney, then presiding, that he did not want his attorney to vigorously cross-examine certain witnesses because another individual had been executed shortly after the murder and he did not want to place anyone else in danger.[6] However,

---

[6]   At trial, a detective testified there was a fingerprint and palm print on an exterior door to the tattoo shop matched to an individual named Jose Z. The police were not able to connect Jose Z. to Jesus or the murder. Jose Z.'s

10

he understood any appointed attorney would have an ethical obligation to put on a zealous defense. The court granted Quintero's request for pro per status, and appointed OAC "to provide a legal runner and reasonable ancillary services."

At a readiness hearing on April 22, 2019, Quintero presented a discovery motion, but agreed to take it off calendar after Judge Devaney explained he first needed to use the informal discovery process. Quintero then said, "I want to file an injunction on OAC," and asserted OAC was not providing adequate assistance with the discovery process. Judge Devaney explained to Quintero that he would need to ask OAC to file a motion regarding his discovery issues and complaints about OAC, in the appropriate department. The trial court and Quintero had the following exchange:

> "[Quintero]: I do want to ask the [c]ourt for a court counsel that is not affiliated with OAC.
>
> "[Court]: Well, you want me to reappoint the public defender?
>
> "[Quintero]: No. I have a conflict of interest with the public defender on my last hearing on the *Faretta* hearing. I made a crucial mistake saying that the person claiming responsibility got executed, but I was wrong. The person claiming responsibility is still out there. The other person known to the alleged victim is the one that got executed and my public defender did not know that after six months of having my case. And I think that she would have -- I told her a few weeks when I filed the *Faretta* and she didn't look up the paperwork.
>
> "[Court]: I don't need all that background in front of the public defenders. [¶] What exactly are you asking me to do?
>
> "[Quintero]: I need for the [c]ourt to assign me co-counsel that is not affiliated with OAC, because OAC makes me sign a contract

_____

mother told the police he was assassinated in Mexico shortly after Jesus's murder.

waiving my rights, and I don't agree with the contract with OAC waiving my rights.

"[Court]: Okay. Mr. Quintero, you are going to either represent yourself or I will appoint the public defender or the alternate public defender, but I'm not appointing co-counsel. You can either be your own attorney or you can be represented by an attorney. I'm not going to appoint co-counsel. [¶] So are you asking me to revoke your pro per status and appoint an attorney to represent you?

"[Quintero]: I believe in the interest of justice it would be better to have a co-counsel so that this moves on faster. And if you say that I'm not having a co-counsel, I'll stay as pro per. But the time it's going to take me --

"[Court]: I don't want to tell you what to do. We had this conversation. I told you what I think about someone in your shoes, with a murder charge, representing themselves. I already told you it's not a wise idea. But there is no such thing as co-counsel. It's either you're on your own in pro per or I assign you an attorney and you can assist that attorney. That attorney has obligations towards you. But there is no co-counsel. So if you want to continue to represent yourself sitting next to an attorney, that is not going to happen. It is either you're on your own or you're represented. What is your choice?

"[Quintero]: I'll stay on my own.

"[Court]: All right."

OAC filed Quintero's motion and the trial court held another hearing on May 1, 2019. Judge Michael T. Smyth was now presiding. Quintero raised a number of specific concerns, which the court addressed. The following exchange occurred at the conclusion of the hearing:

"[Quintero]: May I ask a comment or a question? You said that you were able to appoint a public defender again in this court?

"[Court]: Right.

12

"[Quintero]: Due to my limitations as a KSA[7] inmate, is it possible so that I have full access with the board of lawyers to cross-examine for the court to assign me a co-counsel? That way all the motions that establish my defense, I can send that straight to that co-counsel.

"[Court]: We don't do co-counsel here. I don't do that. We can have someone represent you, but *in this circumstance*, I would not be doing co-counsel or advisory counsel."[8]  (Italics added.)

A few weeks later, on May 20, 2019, Quintero relinquished his pro per status and accepted appointed counsel. He was represented by the public defender at trial.

B.     *Forfeiture*

We begin our analysis with the Attorney General's assertion that Quintero forfeited his claim of error regarding the trial court's denial of his request for advisory counsel by subsequently accepting appointed counsel. The Attorney General provides no authority, nor are we aware of any, establishing that a self-represented defendant waives or forfeits the claim of an erroneous denial of advisory counsel by subsequently relinquishing his self-represented status.

The Attorney General relies primarily on *People v. Stanley* (2006) 39 Cal.4th 913. There, the defendant "orally interposed [a] request for self-

---

7     KSA means "keep separate all" and is a restricted housing status requiring certain inmates be kept separate from others.

8     The transcript for the hearing was sealed for Quintero's benefit because he raised issues relevant to his defense as a self-represented defendant. The quoted portion of the transcript does not reveal those defenses and Quintero included the same passage in his opening brief. He has therefore waived any objection to our inclusion of the passage in this opinion.

representation during a renewed *Marsden*[9] motion made in municipal court one year before his preliminary hearing and nearly two years before the start of trial, out of apparent annoyance or frustration with his first appointed counsel." (*Id.* at pp. 932–933.) The defendant never renewed the request but subsequently accepted a substitution of appointed counsel, as well as the appointment of an additional attorney to assist the primary appointed counsel. (*Id.* at p. 933.) The California Supreme Court concluded, "[i]n light of defendant's subsequent acceptance of several appointed counsel to represent him without ever renewing his request for self-representation," he abandoned his desire to be self-represented and therefore waived the issue on appeal. (*Ibid.*)

We cannot reach the same conclusion regarding Quintero's request for advisory counsel in this case. Quintero raised his request twice in less than two weeks and only accepted appointed counsel after the trial court denied both requests, leaving him with the choice of continuing to represent himself without assistance or accepting appointed counsel. The Attorney General asserts there is no evidence the trial court's denial of Quintero's request for advisory counsel had any bearing on Quintero's decision to accept appointed counsel. To the contrary, Quintero began the second inquiry by confirming the trial court could still appoint a public defender, but indicated his preference was to represent himself with the assistance of "co-counsel." We are not convinced that Quintero's subsequent relinquishment of his pro per status, under these circumstances, constituted a forfeiture of the claim he now asserts. So we will address the merits of Quintero's claim.

---

9     *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

C.    *Advisory Counsel*

Turning to the merits, we are not persuaded the trial court failed to exercise its discretion when it denied Quintero's requests for advisory counsel.

" 'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive.' [Citation.] '[T]he Sixth Amendment guarantees a defendant a right to counsel but also allows him to waive this right and to represent himself without counsel.' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 545.) A defendant who chooses self-representation may request, but does not have a constitutional right to, advisory counsel. (*People v. Doane* (1988) 200 Cal.App.3d 852, 861, disapproved on other grounds in *People v. Barnum* (2003) 29 Cal.4th.1210.) "[T]he decision to appoint an advisory counsel lies within a trial court's discretion." (*Doane,* at p. 861.) If the trial court does appoint advisory counsel, they typically serve a "narrow role . . . giving legal advice and assistance to a defendant who has the control and responsibility for his own defense." (*Id.* at p. 864; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1368 ["When a defendant chooses self-representation, he or she retains primary control over the conduct of the case, and consequently the role of advisory counsel is limited."].)

The California Supreme Court, in *People v. Crandell* (1998) 46 Cal.3d 833 (*Crandell*), explained that: "When a defendant requests appointment of advisory counsel, a court's failure to exercise its discretion is serious error and its denial of a request for advisory counsel in a capital case may constitute an abuse of discretion. [(*People v. Bigelow* (1984) 37 Cal.3d 731, 743 (*Bigelow*).)] We held in *Bigelow* that failure to exercise discretion on a request for advisory counsel *in circumstances where a refusal to grant the*

15

*request would be an abuse of discretion* requires automatic reversal of a resulting conviction because of the inherent difficulty in assessing prejudice." (*Crandell,* at p. 861, citing *Bigelow,* at pp. 744–746, italics in original.) However, as the Court further explained, "*Bigelow, supra,* 37 Cal.3d 731, did not establish a 'fixed rule' that advisory counsel must be appointed for every pro se defendant in a capital case, and thus the question whether denial of a request for advisory counsel would have been an abuse of discretion must be determined on a case-by-case basis." (*Crandell,* at p. 863.)

Where the trial court fails to acknowledge or exercise its discretion in refusing to appoint advisory counsel, but the denial would *not* have been an abuse of discretion if the court *had* exercised its discretion, prejudice is assessed under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Crandell, supra,* 46 Cal.3d at pp. 864–865.) Under the *Watson* standard, the error is prejudicial and requires reversal if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred. (*Watson,* at p. 836.)

Here, Quintero asserts the trial court failed to exercise its discretion because it did not engage "in a reasoned exercise of judgment based on an examination of the particular circumstances of this case," and instead, issued a blanket ruling. (See *Crandell, supra,* 46 Cal.3d at p. 862.) We begin with the presumption the trial court both understood and appropriately exercised its discretion. (See *People v. De Jesus* (1995) 38 Cal.App.4th 1, 29.) The trial court need not affirmatively acknowledge its discretion. (*Ibid.*) Rather, Quintero, as the appellant, has the burden of demonstrating "the trial court failed to perceive its power." (*Ibid.*) We acknowledge the trial court made broad statements about its willingness to appoint advisory counsel in each instance. And those statements might be taken as blanket rulings, if read in

isolation. However, when read in context, we conclude the trial court did understand that it had the discretion to appoint advisory counsel, and that it did consider the specific circumstances of the case before denying Quintero's request.

When Quintero first asked the trial court to assign "co-counsel" not associated with OAC, Judge Devaney responded, in part, "I'm not going to appoint co-counsel." Quintero persisted and the court stated, in part, "there is no co-counsel." Although the later statement appears conclusory in nature, in full context, we perceive it as the trial court's attempt to explain to a self-represented defendant, in simple straightforward language, that co-counsel was not an option *in this case*. Quintero then renewed his request at a subsequent hearing in a different department, with a different judge. Like the first request, the second was in the context of complaints about OAC and, specifically, OAC's efficiency in responding to Quintero's administrative requests. Judge Smyth initially told Quintero, "We don't do co-counsel here," but then clarified, "*in this circumstance*, I would not be doing co-counsel or advisory counsel." (Italics added.)

This is not a case, as Quintero urges, like *Crandell* or *Bigelow*, in which the trial court expressly stated, " 'there is no such thing' " as advisory counsel (*Crandell, supra,* 46 Cal.3d at p. 857) or that advisory counsel is " 'not permitted under California law' " (*Bigelow, supra,* 37 Cal.3d at p. 740), without any further clarification. Instead, this case is more like *People v. Choi* (2021) 59 Cal.App.5th 753 (*Choi*). In *Choi*, the trial court responded to a request for advisory counsel by stating, "That's not the way it's done in this courthouse." (*Ibid*.) However, the trial court also acknowledged it did have the authority to appoint advisory counsel, and explained the defendant made a choice to represent himself and "was 'smarter than most.' " (*Id*. at

17

pp. 767–768.)  Viewing the trial court's comments in context, the appellate court was "satisfied the [trial] court did not apply a blanket practice of denying advisory counsel without exercising its discretion under the circumstances." (*Id.* at p. 769.)  Similarly considering the trial court's comments in context here, we cannot conclude the trial court failed to recognize or exercise its discretion.

Even if we were to conclude the trial court did fail to exercise its discretion, which we do not, reversal would not be warranted.  As we explain, the record before us "does not demonstrate that denial of [Quintero's] request for advisory counsel would have been an abuse of discretion." (*Crandell, supra,* 46 Cal.3d at p. 864.)  Thus, "*Bigelow* is distinguishable and its rule of per se reversal does not govern." (*Ibid.*)  We instead apply the *Watson* harmless error standard and conclude it is not reasonably probable the result would have been more favorable to Quintero in the absence of the purported error. (*Crandell,* at pp. 864–865; *Watson, supra,* 46 Cal.2d at p. 836.)

"The factors which a court may consider in exercising its discretion on a motion for advisory counsel include the defendant's demonstrated legal abilities and the reasons for seeking appointment of advisory counsel." (*Crandell, supra,* 46 Cal.3d at p. 863 [concluding trial court does not abuse its discretion by denying a request for advisory counsel that is essentially a manipulative end run around the denial of a *Marsden* motion].)  The court may also consider the defendant's general education level, the seriousness of the charges, and the overall complexity of the case. (*Bigelow,* 37 Cal.3d at pp. 743–744.)

As an initial matter, we note this case presents a unique set of circumstances.  First, as the trial court acknowledged, this was not a typical case in which Quintero believed he could do a better job than the public

18

defender.  Rather, Quintero's stated reason for wanting to represent himself was he did not want his attorney to "adequately, diligently represent" him at trial.  As Quintero explained to the trial court, he did not want his appointed attorney to vigorously cross-examine certain witnesses.

Second, the scope of Quintero's request for advisory counsel was limited.  After raising complaints about OAC, Quintero asked for "co-counsel that is not affiliated with OAC, because . . . [he did not] agree with the contract with OAC waiving [his] rights."  Quintero renewed his request at the next hearing after raising complaints about the efficiency of OAC, and said he wanted "co-counsel" so he could send "all the motions that establish my defense . . . straight to that co-counsel."  Quintero did not, at any point, indicate he needed legal assistance to prepare those motions, or any other part of his defense.

Third, Quintero's requests appear to have been motivated primarily by his stated concerns with the public defender and OAC.  Quintero first asked for "counsel that is not affiliated with OAC."  When the trial court inquired whether Quintero wanted it to reappoint the public defender, Quintero declined, citing the alleged conflict of interest, and stated he wanted "co-counsel that is not affiliated with OAC."  Thus, the record suggests Quintero was actually seeking substitute counsel for OAC, or, put another way, assistance from an appointed counsel that was not the public defender or OAC.[10]  As the Court in *Crandell* explained, it is appropriate for a trial court to deny a request for advisory counsel where there is "evidence [of] a

---

[10]    Notably, the trial court did hold several *Marsden* hearings and did specifically address the public defender's alleged conflict of interest, but Quintero does not assert the trial court erred in any of its rulings at those proceedings.

manipulative endeavor to obtain the appointment of private counsel without a showing of conflict or inadequacy sufficient to remove the public defender in the first instance." (*Crandell, supra*, 46 Cal.3d at p. 863.)

Quintero relies on *People v. Mattson* (1959) 51 Cal.2d 777 to assert the denial of his request was error because advisory counsel would have promoted justice and allowed the matter to proceed in an "orderly and expeditious" manner. (*Id.* at p. 797.)  In *Mattson*, the California Supreme Court confirmed matters related to the appointment of advisory counsel "are within the sound discretion of the trial judge, who is in a position to appraise the courtroom situation and determine what procedure will best promote orderly, prompt and just disposition of the cause." (*Ibid.*)  The Court continued, "[t]he [trial] court, however, should *not* permit a litigant both to have counsel and to actively participate in the conduct of the case (as by conducting examination of witnesses, interposing objections, arguing points of law or of fact, addressing the jury, etc.) *unless* the court on a substantial showing determines that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered or delayed." (*Ibid.*, italics added.)  The Court did not hold, as Quintero suggests, the trial court *must* appoint advisory counsel any time doing so would promote justice or efficiency.  Regardless, Quintero did not argue he needed advisory counsel for the presentation of his case at trial, nor did he make the type of showing described in *Mattson*.

Moreover, Quintero was educated and capable of self-representation. He was competent, could read and write in English, and had completed approximately 120 college credits.  During the *Faretta* hearing, the trial court observed: "Having talked to Mr. Quintero, I think he's much brighter and

well[-]spoken than most defendants who ask to go pro per, so I don't think there's going to be a competency issue." Quintero argues he did not have any legal knowledge or experience but, of course, the vast majority of self-represented litigants do not. The record demonstrates Quintero was capable of understanding the proper mechanism for bringing a discovery motion once the trial court explained the discovery process. Although the trial court indicated some of the claims included in the motion were civil matters, and were not appropriate for a criminal case, Quintero was able to obtain at least some relief with respect to other, properly raised issues. And again, Quintero never directly indicated he needed assistance with understanding the law or legal processes; he simply raised concerns with the efficiency of OAC's *administrative* services.

Quintero further asserts the charges against him were serious and the case was both legally and factually complex. We acknowledge the charges were serious, and there is at least some suggestion in the record the Attorney General was still considering the death penalty when the trial court refused to appoint advisory counsel. However, the case ultimately was not a capital case and did not involve the type of difficult statutory construction or constitutional issues present in *Bigelow*. (See *Bigelow, supra,* 37 Cal.3d at p. 743 ["The case arose under the 1978 death penalty initiative, an enactment rife with constructional and constitutional difficulties, which had not yet been judicially interpreted."].) Quintero argues the different charges here required different mental states but does not assert, or present any evidence in the record indicating, he had difficulty understanding or applying the relevant legal principles.

In *Crandell*, our high court distinguished the holding in *Bigelow* and found the *Watson* standard of prejudice applicable, where "the defendant was

21

charged only with the multiple-murder special circumstances, which presented no significant construction problems," and "demonstrated substantial competence." (*Crandell, supra,* 46 Cal.3d at p. 864.)  Likewise, here, the charges did not raise any novel constitutional issues, Quintero's request for assistance was limited, and Quintero was substantially competent.  Thus, the denial of Quintero's request would not have been an abuse of the trial court's discretion, had the trial court exercised that discretion.

Applying the *Watson* standard, it is not "reasonably probable that different verdicts would have been returned had [Quintero] received the assistance of advisory counsel." (*Crandell, supra,* 46 Cal.3d at p. 866.)  Importantly, unlike the defendants in *Bigelow* and *Crandell,* Quintero was ultimately represented by competent, appointed counsel at trial and the jury still convicted him on all asserted charges.  Quintero's reason for initially rejecting appointed counsel was he wanted to present a *less* zealous defense.  Given Quintero's explanation, it is difficult to conceive of a scenario in which he would have received a better outcome at trial if he had remained self-represented, even with the assistance of advisory counsel.

In sum, we conclude the trial court did not fail to exercise its discretion when it denied either of Quintero's requests for advisory counsel, but even if it did, the error was not prejudicial and does not warrant reversal.

## II.

### *Any Unpaid Portion of the $154 Criminal Justice Administration Fee Shall Be Vacated*

Quintero requests we modify the judgment to strike the $154 criminal justice administration fee based on recent changes to the law.

After Quintero was sentenced, Assembly Bill No. 1869 (2019–2020 Reg. Sess.) (Assembly Bill No. 1869) was signed into law.  As of July 1, 2021, pursuant to Assembly Bill No. 1869, the statutory provision pursuant to which the court ordered Quintero to pay a $154 criminal justice administration fee (former section 29550.1 of the Government Code) was repealed, and Government Code section 6111 was added.  (Assem. Bill No. 1869, §§ 11, 24.)  Government Code section 6111, subdivision (a), provides that: "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

The Attorney General concedes, and we agree, Quintero is entitled to vacatur of any unpaid balance of his criminal justice administration fee as of July 1, 2021.

23

## DISPOSITION

Any portion of the $154 criminal justice administration fee imposed pursuant to former Government Code section 29550.1 unpaid as of July 1, 2021 is vacated. The judgment as modified is affirmed.

DO, J.

WE CONCUR:

HALLER, Acting P. J.

O'ROURKE, J.

24

# EXHIBIT C



# IN THE SUPREME COURT
# OF THE STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) No, _____ |
| | ) |
| | ) Court of Appeal No. D077996 |
| Plaintiff and Respondent, | ) |
| | ) San Diego County Superior Court |
| v. | ) No. SCS303737 |
| | ) |
| DANIEL RODRIGUEZ QUINTERO, | ) |
| | ) |
| Defendant and Appellant. | ) |
| | ) |

## PETITION FOR REVIEW

Appeal from the Judgment of the Superior Court
of the State of California for the
County of San Diego

Honorable Timothy Walsh, Judge

John P. Dwyer, SBN 106860
DWYER + KIM, LLP
601 Van Ness Ave., Suite E-115
San Francisco, CA 94102
Telephone: 415.994.2893
Email: dwyer@dwyerkim.com

Attorney for Appellant,
DANIEL RODRIGUEZ QUINTERO

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... 3

ISSUES PRESENTED .......................................................................... 4

REASONS TO GRANT REVIEW.............................................................. 4

STATEMENT OF THE CASE AND FACTS................................................. 6

ARGUMENT ...................................................................................... 6

I.   This court should grant review because the Court of
     Appeal decision, holding that the trial court exercised
     its discretion when it denied Quintero's request for
     advisory counsel, is contrary to this court's precedent ........ 6

     A.   Factual and procedural background ........................... 7

     B.   The trial court abused its discretion because it
          failed to exercise its discretion when it summarily
          denied Quintero's request for advisory counsel
          based on a blanket policy........................................... 9

II.  The Court of Appeal's alternative holding, that had the
     trial court exercised its discretion, it would not have been
     an abuse of discretion to deny the request to appoint
     advisory counsel, conflicts with this court's precedent...... 11

     A.   The charges were extremely serious and Quintero
          was facing the death penalty..................................... 12

     B.   The case was legally and factually complex............. 13

     C.   Quintero had no legal knowledge, experience, or
          ability .................................................................... 16

     D.   There was no evidence that Quintero sought
          advisory counsel for manipulative purposes ............ 17

     E.   Granting the request for advisory counsel would
          have advanced the twin goals of assisting Quintero
          in representing himself and of promoting the
          orderly, prompt, and just disposition of the case ..... 18

CONCLUSION .................................................................................. 20

CERTIFICATE PURSUANT TO RULE 8.504(d)(1) ................................ 21

## TABLE OF AUTHORITIES

### Cases

*Indiana v. Edwards* (2008) 554 U.S. 164...................................18-19

*In re Cortez* (1971) 6 Cal.3d 78.......................................10

*McKaskle v. Wiggins* (1984) 465 U.S. 168 ......................18

*People v. Banks* (2015) 61 Cal.4th 788...........................15

*People v. Bigelow* (1984) 37 Cal.3d 731.....................5, 9, 11-14, 16

*People v. Choi* (2021) 59 Cal.App.5th 753....................9-10

*People v. Clark* (1992) 3 Cal.4th 41...............................6

*People v. Clark* (2016) 63 Cal.4th 522...........................15

*People v. Crandell* (1988) 46 Cal.3d 833 .....6-7, 9-10, 12, 14, 16, 18

*People v. Garcia* (2000) 78 Cal.App.4th 1422 .............15

*People v. James* (2011) 202 Cal.App.4th 323................15

*People v. Lewis* (2001) 25 Cal.4th 610...........................14

*People v. Mattson* (1959) 51 Cal.2d 777 ....................6, 18

*People v. Sandoval* (2015) 62 Cal.4th 394 ...................14

*People v. Streeter* (2012) 54 Cal.4th 205 ......................14

### Statutory Provisions

Pen. Code, § 209, subd. (a)..............................................14

### Rules of Court

Cal. Rules of Court, rule 8.500(b)(1) ....................5, 7, 12

TO THE HONORABLE TANI CANTIL-SAKAUYE, CHIEF
JUSTICE OF THE STATE OF CALIFORNIA, AND TO THE
HONORABLE ASSOCIATE JUSTICES OF THE SUPREME
COURT:  Pursuant to Rule 8.500 of the California Rules of Court,
Daniel Rodriguez Quintero petitions for review of the May 11,
2022, unpublished decision of the Court of Appeal, Fourth
Appellate District, Division One, a copy of which is attached as
Exhibit A.

### ISSUES PRESENTED

1.      Whether the trial court abused its discretion when it
denied appellant's request for appointment of advisory counsel
because its ruling was not based on an exercise of discretion but
rather was based on a blanket policy of not appointing advisory
counsel.

2.      Whether the convictions are reversible per se
because, had the trial court exercised its discretion in ruling on
appellant's request to appoint advisory counsel, it would have
been an abuse of discretion to deny the request.

### REASONS TO GRANT REVIEW

Before trial, Quintero asked the court to appoint counsel to
assist him in representing himself.  (2 RT 309-310.)  The trial
court summarily denied his request.  (2A SRT 228.)  On appeal,
Quintero argued that the trial court failed to exercise its
discretion and thus abused its discretion.  Further, because it
would have been an abuse of discretion to deny Quintero's
request had the court exercised its discretion, the convictions
were reversible per se.

-4-

The Court of Appeal affirmed the judgment. It first held that the trial court did not fail to exercise its discretion when it denied Quintero's request for advisory counsel. (Opn. 15-18.) In the alternative, it held that, even if the trial court did not exercise its discretion, it would not have been an abuse of discretion to deny the request, and thus the convictions were not reversible per se. (Opn. 18-22.) The court then held that under *Watson* Quintero was not prejudiced by the court's the failure to exercise discretion. (Opn. 22.)

This court should grant review to secure uniformity of decision. (Cal. Rules of Court, rule 8.500(b)(1).) The Court of Appeal holdings are contrary to this court's precedent in two ways. *First*, the record shows that the trial court declared it had a blanket policy of not appointing advisory counsel: "We don't do co-counsel here. I don't do that." (2A SRT 228.)[1] The conclusion that the trial court ruled based on a blanket policy was reinforced by two additional factors – the record contains no indication that the trial court knew it had or was exercising discretion to appoint advisory counsel and no indication that it considered any relevant circumstances that a reasoned exercise of judgment would require. The Court of Appeal's holding that the trial court's ruling manifested an exercise of discretion is contrary to this court decision in *People v. Bigelow* (1984) 37 Cal.3d 731, which requires a trial court to exercise its discretion when ruling on a motion to appoint advisory counsel.

---

[1] As explained in footnote 2, *post*, the parties and the Court of Appeal treated trial court's statement as referring to the appointment of advisory counsel.

*Second*, an analysis of the relevant circumstances in this case shows that the Court of Appeal's alternative holding – that it would not have been an abuse of discretion to deny the motion – also is contrary to *Bigelow*. Each of the circumstances identified in *Bigelow* favored appointment of advisory counsel here.

## STATEMENT OF THE CASE AND FACTS

Except as otherwise noted herein, appellant adopts the statement of the case and facts in the Court of Appeal decision. (Opn. 3-10.)

## ARGUMENT

I.    **This court should grant review because the Court of Appeal decision, holding that the trial court exercised its discretion when it denied Quintero's request for advisory counsel, is contrary to this court's precedent.**

A trial court may appoint advisory counsel to "assist an indigent defendant who elects self-representation" (*People v. Crandell* (1988) 46 Cal.3d 833, 861) and to "promote orderly, prompt and just disposition of the cause" (*People v. Mattson* (1959) 51 Cal.2d 777, 797). Appointing advisory counsel is especially important in legally or factually complex cases involving serious charges and may be necessary to avoid turning the proceedings into a charade that demeans the defendant rather than respects his constitutionally guaranteed autonomy. (See *People v. Clark* (1992) 3 Cal.4th 41, 116 [courts must "interpret *Faretta* in a reasonable fashion to vindicate the legitimate rights of defendants while at the same time avoiding turning the trial into a charade"].)

A trial court may not deny a request for advisory counsel based on a blanket policy or practice.  Rather, it must engage "in a reasoned exercise of judgment based on an examination of the particular circumstances of [the] case." (*Crandell, supra,* 46 Cal.3d at p. 862.)

The Court of Appeal rejected Quintero's argument that the trial court erroneously denied his request for advisory counsel based on a blanket policy or practice.  Because the Court of Appeal's holding is to be contrary to this court's precedent, this court should grant review to secure uniformity of decision.  (Cal. Rules of Court, rule 8.500(b)(1).)

### A.    Factual and procedural background.

On February 15, 2019, the court granted Quintero's request to represent himself.  (1 RT 139-140.)  On April 22, Quintero asked the court to appoint counsel to assist him:

| | |
|---|---|
| Quintero: | I do want to ask the Court for a court counsel that is not affiliated with OAC [Office of Assigned Counsel]. |
| Court: | Well, you want me to reappoint the public defender? |
| Quintero: | No:  I have a conflict of interest with the public defender on my last hearing on the *Faretta* hearing. . . . |
| Court: | . . . What exactly are you asking me to do? |
| Quintero: | I need for the Court to assign me co-counsel that is not affiliated with OAC, because OAC makes me sign a contract waiving my rights, and I don't agree with the contract with OAC waiving my rights. |
| Court: | Okay.  Mr. Quintero, you are going to either represent yourself or I will appoint |

the public defender or the alternate public defender, but I'm not appointing co-counsel. You can either be your own attorney or you can be represented by an attorney. I'm not going to appoint co-counsel. [¶] So are you asking me to revoke your pro per status and appoint an attorney to represent you?

Quintero:   I believe in the interest of justice it would be better to have a co-counsel so that this moves on faster. And if you say that I'm not having a co-counsel, I'll stay as pro per. But the time it's going to take me —

Court:      I don't want to tell you what to do. We had this conversation. I told you what I think about someone in your shoes, with a murder charge, representing themselves. I already told you it's not a wise idea. But there is no such thing as co-counsel. It's either you're on your own in pro per or I assign you an attorney and you can assist that attorney. That attorney has obligations towards you. But there is no co-counsel. So if you want to continue to represent yourself sitting next to an attorney, that is not going to happen. It is either you're on your own or you're represented. What is your choice?

Quintero:   I'll stay on my own.

(2 RT 309-310.)

On May 1, at the end of an ex parte hearing about Quintero's complaints regarding ancillary services he was receiving, Quintero again asked the court to appoint counsel to assist him, and the court again summarily denied the request.

Quintero:   Due to my limitations as a KSA inmate ["Keep Separate All," a type of restrictive protective custody], is it possible so that I

-8-

> have full access with the board of lawyers to cross-examine for the court to a [*sic*] assign me a co-counsel? That way all the motions that establish my defense, I can send that straight to that co-counsel.

Court:   We don't do co-counsel here. I don't do that. We can have someone represent you, but in this circumstance, I would not be doing co-counsel or advisory counsel.

(2A SRT 228.)[2]

On May 20, 2019, Quintero moved to relinquish his pro per status. (3 RT 503.) The court granted the motion and reappointed the public defender's office. (3 RT 506.)

### B.   The trial court abused its discretion because it failed to exercise its discretion when it summarily denied Quintero's request for advisory counsel based on a blanket policy.

In ruling on a motion to appoint advisory counsel, a court may not base its ruling on a blanket policy or practice. Rather, it must engage "in a reasoned exercise of judgment based on an examination of the particular circumstances of [the] case." (*Crandell*, *supra*, 46 Cal.3d at p. 862, citing *People v. Bigelow* (1984) 37 Cal.3d 731, 743; see also *People v. Choi* (2021) 59 Cal.App.5th 753, 766-767 [applying a blanket practice or policy to

---

[2] Although Quintero asked the court to appoint "court counsel" and "co-counsel" (3 RT 309; 2A SRT 228), in context, he meant that he wanted the appointment of advisory counsel, i.e., an attorney who would provide legal advice but would not speak for him or participate in court proceedings (3 RT 310; 2A SRT 228). The trial court understood that Quintero was asking for advisory counsel because it expressly said it would not appoint advisory counsel. (2A SRT 228.) The Court of Appeal treated Quintero's request as one for advisory counsel. (See opn. 2, fn. 2.)

deny appointment of advisory counsel would be an abuse of discretion].)

Here, the trial court did not engage in a reasoned exercise of judgment, but instead denied Quintero's motion based on a blanket policy: "We don't do co-counsel here. I don't do that." (2A SRT 228.) The trial court presented the issue as a binary choice that did not include the appointment of advisory counsel. "It's either you're on your own in pro per or I assign you an attorney and you can assist that attorney. . . . So if you want to continue to represent yourself sitting next to an attorney, that is not going to happen. It is either you're on your own or you're represented." (2 RT 310.)

The court's statements betray a rigidity reflecting a blanket rule or practice that foreclosed a reasoned exercise of discretion based on "an examination of the particular circumstances" of the case. (*Crandell, supra,* 46 Cal.3d. at p. 862; see also *In re Cortez* (1971) 6 Cal.3d 78, 85-86 ["To exercise the power of judicial discretion all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision."].) By failing to exercise discretion, the trial court abused its discretion.

The Court of Appeal rejected this argument, holding that the trial court exercised its discretion when it summarily denied Quintero's request for advisory counsel. The court "acknowledge[d] the trial court made broad statements about its willingness to appoint advisory counsel in each instance [that Quintero requested advisory counsel]. And those statements

might be taken as blanket rulings, if read in isolation. However, when read in context, we conclude the trial court did understand that it had the discretion to appoint advisory counsel, and that it did consider the specific circumstances of the case before denying Quintero's request." (Opn. 17-18.)

In particular, the Court of Appeal focused on the trial court's statement that, "in this circumstance, I would not be doing co-counsel or advisory counsel." (2A SRT 228.) According to the Court of Appeal, this statement showed the trial court exercised its discretion based on Quintero's particular circumstances. (Opn. 17, italicizing the expression.) But that reading is not plausible. The quoted language immediately follows the trial court's statement of its blanket policy: "We don't do co-counsel here. I don't do that." The "circumstance" to which the trial court referred was its blanket policy. This conclusion is strongly reinforced by trial court's failure to acknowledge that it had or was exercising discretion or to identify any relevant circumstances that would inform an exercise of discretion. (See, e.g., *Bigelow, supra,* 37 Cal.3d at pp. 743-744 [identifying circumstances relevant to a motion for appointment of advisory counsel].)

**II.    The Court of Appeal's alternative holding, that had the trial court exercised its discretion, it would not have been an abuse of discretion to deny the request to appoint advisory counsel, conflicts with this court's precedent.**

When a trial court fails to exercise its discretion in denying a request for advisory counsel, the reviewing court must determine whether, had the trial court exercised its discretion,

refusing the request would have been an abuse of discretion. If the denial would have been an abuse of discretion, the error is reversible per se. (*Bigelow, supra*, 37 Cal.3d at p. 744.) If, on the other hand, the denial would not have been an abuse of discretion, the trial court's error is reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818. (*Crandell, supra*, 46 Cal.3d at pp. 864-865.).

In *Bigelow*, this court identified the following factors to determine whether a trial court would have abused its discretion in denying the defendant's request for appointment of advisory counsel: the seriousness of the charges; the factual and legal complexity of the case; the defendant's general education, legal knowledge, and demonstrated legal abilities; and any evidence that the request for advisory counsel reflected a manipulative purpose. (*Bigelow, supra*, 37 Cal.3d at pp. 743-744; see also *Crandell, supra*, 46 Cal.3d at pp. 863-864.)

Applying the *Bigelow/Crandell* factors, the Court of Appeal held it would not have been an abuse of discretion to deny the request to appoint advisory counsel. (Opn. 18-22.) However, the Court of Appeal's application of those factors is in tension with the reasoning and analysis in *Bigelow* and *Crandell*. This court should grant review to secure uniformity of decision and to provide trial courts with greater clarity and guidance in applying those factors. (Cal. Rules of Court, rule 8.500(b)(1).)

## A. The charges were extremely serious and Quintero was facing the death penalty.

The Court of Appeal acknowledged that the charges were serious and that Quintero was facing the death penalty when the

court denied his request for advisory counsel. (Opn. 21.) But the court summarily dismissed this factor because the prosecution "ultimately" – that is, long after the trial court denied Quintero's request – decided not to seek the death penalty. (Opn. 21.) But appellate review of a trial court ruling must be based on the record that existed at the time of the ruling. (See, e.g., *People v. Farley* (2009) 46 Cal.4th 1053, 1082.)

Regardless, the Court of Appeal decision unreasonably minimized the significance of this factor. The charges against Quintero – murder, torture, and kidnapping for ransom or extortion – were extremely serious. In addition, the indictment alleged kidnapping and torture special circumstances, which, if found true, required an LWOP sentence at a minimum and made Quintero eligible for the death penalty. (1 CT 9-10.) On May 1, 2019, when the court denied the request for advisory counsel for a second time, Quintero still was facing the death penalty. (See 4A RT 742.)

The charges were every bit as serious as the charges in *People v. Bigelow*, *supra*, where the defendant was charged with first-degree murder, robbery, and kidnapping, along with firearm and special circumstances allegations. (37 Cal.3d at p. 737.) *Bigelow* is indistinguishable.

**B.    The case was legally and factually complex.**

The Court of Appeal held that the case was not complex because, in contrast to *Bigelow*, it did not involve novel constitutional issues. (Opn. 21-22.) But the existence of "novel constitutional issues" is not the sine qua non of a legally and factually complex case.

In *Bigelow*, this court found the case involved "complex additional legal and factual issues" in part because the recently enacted death penalty statute was "rife with constructional and constitutional difficulties" and "had not yet been judicially interpreted." (37 Cal.3d at p. 743.) And, as the Court of Appeal noted, in *Crandell*, this court held that case was not complex because "the defendant was charged only with the multiple-murder special circumstances, which presented no significant construction problems on the facts of the case." (*Crandell, supra,* 46 Cal.3d at p. 864.)

But unlike *Crandell*, this case was legally complex because of the number of charges and the multiple theories for each charge. The prosecution's case for murder proceeded under three different theories – premeditated murder, felony murder, and torture-murder. Moreover, there were two different underlying felonies for felony murder – kidnapping and burglary. (2 CT 320.) Each theory of murder had different elements, particularly different mental states. (See, e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 244-245 [describing the mental states for torture]; *People v. Sandoval* (2015) 62 Cal.4th 394, 424 [describing the metal states for premeditated murder]; *People v. Lewis* (2001) 25 Cal.4th 610, 642 [describing the mental state for felony murder].) The kidnapping charge required proof that Quintero had the intent to commit extortion or exact money from another person. (Pen. Code, § 209, subd. (a).) The special circumstance allegations (kidnapping and torture) required proof that Quintero was the actual killer or was an aider and abettor who either had

the intent to kill or was a major participant who acted with reckless disregard for human life. The last finding required Quintero to address a multi-factor analysis about his actions and mental state. (See, e.g., *People v. Banks* (2015) 61 Cal.4th 788, 803; *People v. Clark* (2016) 63 Cal.4th 522, 619-622.)

The case also was factually complex. Quintero was present during the crime, but the evidence did not clearly establish his role in the incident. For example, in closing argument, the prosecutor conceded that another person was involved and said it was unclear if Quintero was the actual killer or an aider and abettor. (17 RT 3435.) Quintero's legal culpability also required assessment of the extent of his intoxication and its effect on his mental states for the offenses and special circumstance allegations. Further factual complexity arose from the extensive evidence of Quintero's post-homicide conduct, which was relevant to his mental state and credibility as a witness, and Jose's conduct in not coming to his brother's aid and later lying to police, which was relevant to his credibility as a witness.

Thus, this case was unlike typical cases involving the denial of advisory counsel where only one discrete issue was in dispute. (See *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1429 [where it was undisputed the defendant shot the two victims, the sole issue of intent "was not an overly complex matter – either legally or factually"]; *People v. James* (2011) 202 Cal.App.4th 323, 339 [where the sole issue was the identity of the robber, the case was not factually or legally complex].) Here the factual and legal

complexity strongly supported the appointment of advisory
counsel.

### C.    Quintero had no legal knowledge, experience, or ability.

The Court of Appeal wrote that Quintero "was educated
and capable of self-representation.  He was competent, could read
and write in English, and had completed approximately 120
college credits." (Opn. 20.)  But these facts do not undermine the
conclusion, based on the record, that Quintero was poorly
equipped to represent himself in this factually and legal complex
case.

In *Bigelow*, there was no evidence that the defendant had
any demonstrated legal abilities, and he apparently had only a
minor criminal record and never represented himself.  (See
*Bigelow, supra*, 37 Cal.3d 744.)  The defendant in *Crandell* was
at the other end of the spectrum.  He was

> an obviously intelligent, literate, and articulate
> advocate in his own cause who had acquitted himself
> well at the preliminary hearing.  He had brought
> discovery and numerous other motions, had
> subpoenaed witnesses, and had engaged in skillful
> examination and cross-examination at the
> preliminary hearing.  Defendant had demonstrated
> in his motion papers an ability to research the law, to
> cite applicable precedent, and to engage in reasoned
> argument.

(*Crandell, supra*, 46 Cal.3d. at p. 864.)

Quintero's experience with the criminal justice system,
legal knowledge, and demonstrated legal abilities were like those
of the defendant in *Bigelow* and utterly unlike the defendant's in
*Crandell*.  Although he attended college (1 SCT 5; 1 RT 126-127),

Quintero had no training in the law and never represented himself. (1 RT 127.) Before this case, Quintero had never been charged with a criminal offense. (2 CT 380, 382 [probation report].)

The record shows that Quintero was overwhelmed by the challenges of pretrial preparation and litigation while being incarcerated, and he focused on irrelevant matters. Charged with a capital offense, he was kept in restrictive protective custody and only had access to the law library three hours per week. (2A SRT 217.) During a hearing at which he complained about the ancillary services he was receiving as a self-represented defendant, his arguments showed that he lacked even a rudimentary understanding of what was relevant to the defense of his case. (See 2A SRT 208 [the court describing Quintero's list of complaints as "mostly incoherent from my perspective in addressing things that would not, one, be addressed by this court, but also, two, likely not be any part of your criminal case"].) Quintero was a naïf in the courtroom.

### D.   There was no evidence that Quintero sought advisory counsel for manipulative purposes.

The record is devoid of any evidence that Quintero requested advisory counsel for some manipulative purpose. In denying Quintero's request, the court did not even hint that it though Quintero was being manipulative. The Court of Appeal did not find otherwise.

E.   **Granting the request for advisory counsel
would have advanced the twin goals of
assisting Quintero in representing himself and
of promoting the orderly, prompt, and just
disposition of the case.**

The Court of Appeal decision mistakenly stated that
Quintero suggested that this factor alone required the
appointment of advisory counsel. (Opn. 20.) But he did argue
that it supported the conclusion that it would have been an abuse
of discretion to deny Quintero's request.

The appointment of advisory counsel assists a defendant in
exercising his Sixth Amendment right to represent himself and,
at the same time, promotes the orderly, prompt and just
disposition of the case. (*Crandell, supra,* 46 Cal.3d at p. 861; *v.
Mattson, supra,* 51 Cal.2d at p. 797.) By denying Quintero's
request, and compelling him to accept appointed counsel, the trial
court ensured an orderly and prompt trial. But the ruling
undermined Quintero's Sixth Amendment right to self-
representation and soon forced him to relinquish that right.

The right to self-representation "exists to affirm the dignity
and autonomy of the accused." (*McKaskle v. Wiggins* (1984) 465
U.S. 168, 176-177.) But granting self-representation will do little
to affirm a defendant's dignity and autonomy, even if he meets
*Faretta*'s minimal standards for self-representation, if he lacks
the experience, knowledge, and capacity to prepare and litigate
his defense in a legally and factually complex case involving the
most serious criminal charges. (Cf. *Indiana v. Edwards* (2008)
554 U.S. 164, 176 ["a right of self-representation at trial will not
'affirm the dignity' of a defendant who lacks the mental capacity

-18-

to conduct his defense without the assistance of counsel"].)  It is in these circumstances that the appointment of advisory counsel is most warranted.

When it denied Quintero's request, the court repeatedly told Quintero that his only choices were to go it alone or be represented by counsel.  "So if you want to continue to represent yourself sitting next to an attorney, that is not going to happen. It is either you're on your own or you're represented."  (2 RT 310; see also 2 RT 310 ["You can either be your own attorney or you can be represented by an attorney. . . . So are you asking me to revoke your pro per status and appoint an attorney to represent you?" . . . It's either you're on your own in pro per or I assign you an attorney and you can assist that attorney."]; 2A SRT 228 ["We can have someone represent you, but in this circumstance, I would not be doing co-counsel or advisory counsel."].)  The court's framing of Quintero's choices did not take account of the role advisory counsel could have played in assisting Quintero in exercising his constitutional right to represent himself in a legal and factually complex case involving very serious charges.

Nineteen days later, Quintero gave in and relinquished his pro per status.  (3 RT 503, 506.)  Denying Quintero's request for advisory counsel had the effect of compelling Quintero to give up his constitutional right to represent himself.  Although the reappointment of the public defender to represent Quintero for the rest of the proceedings ensured an orderly and prompt disposition of the case, it came at the cost of denying Quintero his constitutional right to represent himself.

In sum, the Court of Appeal decision regarding the application of the *Bigelow/Crandell* is in tension with this court's decisions, and this court should grant review to secure uniformity of decision.

### CONCLUSION

For the foregoing reasons, this court should grant review.

DATED:  June 16, 2022

Respectfully submitted,

_____/s/_____
John P. Dwyer
Attorney for Appellant
DANIEL RODRIGUEZ QUINTERO

## CERTIFICATE PURSUANT TO RULE 8.504(d)(1)

I, John P. Dwyer, counsel for appellant, certify pursuant to the California Rules of Court that the word count for this document is 4,156 words, excluding the tables, this certificate, and any attachment permitted under rule 8.504(d)(3). This document was prepared in Microsoft Word, and this is the word count generated by the program for this document.

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California, on June 16, 2022.

_____/s/_____
John P. Dwyer
Attorney for Appellant
Daniel Rodriguez Quintero

Re: *People v. Quintero*, D077996

## ATTORNEY'S CERTIFICATE OF ELECTRONIC SERVICE
### AND SERVICE BY MAIL

I declare that I am an active member of the State Bar of California and am not a party to this cause. My electronic service address is dwyer@dwyerkim.com and my business address is 601 Van Ness Ave., Suite E-115, San Francisco, CA 94102.

On the date shown below, I served the persons and/or entities listed below by the method checked. For those marked "Served Electronically," I transmitted a PDF version of **PETITION FOR REVIEW** by TrueFiling electronic service or by email to the email service address provided below. For those marked "Served by Mail," I deposited in a U.S. Mailbox regularly maintained by the United States Postal Service at San Francisco a copy of the above document in a sealed envelope with postage fully prepaid, addressed as provided below:

| | |
|---|---|
| Office of the Attorney General<br>SDAG.Docketing@doj.ca.gov<br><br>x    Served Electronically<br>__    Served by Mail | Appellate Defenders, Inc.<br>eservice-court@adi-sandiego.com<br><br>x    Served Electronically<br>__    Served by Mail |
| David Grapilon<br>San Diego County DA's Office<br>DA.Appellate@sdcda.org<br><br>x    Served Electronically<br>__    Served by Mail | Hon. Judge Timothy Walsh<br>San Diego County Superior Court<br>Appeals.Central@SDCourt.ca.gov<br><br>x    Served Electronically<br>__    Served by Mail |
| Daniel Rodriguez Quintero, BN3161<br>Pleasant Valley State Prison<br>PO Box 8500<br>Coalinga, CA 93210<br><br>__    Served Electronically<br>x    Served by Mail | Clerk, Court of Appeal<br>Fourth Appellate District<br>Division One<br><br>x    Served Electronically<br>__    Served by Mail |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 16, 2022, at San Francisco, California.

_____/s/_____
John P. Dwyer
SBN: 106860

# EXHIBIT D



CENTRAL DIVISION
450 B Street, Suite 900
San Diego, CA 92101
(619) 338-4700
FAX (619) 338-4811

**NORTH COUNTY BRANCH**
495 La Tortuga Drive, Suite 100
Vista, CA 92081-4323
(760) 945-4000
FAX (760) 726-1308

**SOUTH BAY BRANCH**
303 H Street, Suite 400
Chula Vista, CA 91910-5551
(619) 498-2001
FAX (619) 498-2039

**EAST COUNTY BRANCH**
250 E. Main Street, Sixth Fl.
El Cajon, CA 92020
(619) 579-3316
FAX (619) 441-4744

**JUVENILE DELINQUENCY**
5530 Overland Drive, Suite 110
San Diego, CA 92123-1261
(858) 974-5757
FAX (858) 974-5858



# County of San Diego

## OFFICE OF THE PRIMARY PUBLIC DEFENDER

**ANGELA BARTOSIK**
**CHIEF DEPUTY**

September 15, 2020

The Honorable Timothy R. Walsh
Judge of the Superior Court
San Diego Superior Court, South County Division
500 3rd Avenue
Chula Vista, CA 91910

RE: Daniel Quintero, SCS303737

Dear Judge Walsh:

I am writing this letter on behalf of my client Daniel Quintero to better lay out my client's situation for the purposes of sentencing and any further hearings regarding his custody status. I think that it is clear that this crime was a direct result of my client's excessive use of alcohol.

The defense presented a voluntary intoxication defense that Mr. Quintero committed the offenses as a result of his being under the influence of alcohol. Although the jury found Mr. Quintero guilty of the charges, including First Degree Murder, I think it is important to consider that the prosecution provided three alternate theories to support the First Degree Murder charge. The prosecutor argued that the murder was either premeditated, or a torture murder, or felony murder resulting from a burglary or kidnapping. Although the jury was not required to unanimously agree on which murder theory they chose to convict upon, I think the strongest theory was that of felony murder as an accomplice. I think it is clear from the evidence that although it is arguable that Mr. Quintero played a significant role in the crime, I do not believe the murder would have occurred but for the presence of the other perpetrator who was not prosecuted. Additionally, the jury's verdict does not indicate whether they agreed that alcohol played an important role in Mr. Quintero's actions on the morning of this offense.

## FACTS:

On December 17, 2017, Daniel Quintero was staying at the Big 7 Motel in Chula Vista. Daniel had been drinking alcohol heavily throughout the preceding afternoon and evening and into the early morning hours of Sunday, December 17th. At just after 3:00 a.m., Daniel wandered a

couple of doors down from the motel to Raza Tattoo. Jesus Quiroz owned Raza Tattoo and was present at the shop drinking and consuming cocaine with a friend, Manual Arrellano. Manual Arrellano left the shop at approximately 3:01 a.m., leaving Jesus alone. An altercation between Daniel and Jesus occurred at the door of Raza Tattoo. Jesus called his brother, Jose Quiroz, at 3:06 a.m. to tell Jose that Daniel was at the door of the shop. The Quiroz brothers and Daniel were not complete strangers, they had a mutual friend in common. Jose Quiroz owned the clothing store, Raza Wear, located on the bottom floor of the Raza Tattoo. Jose also admitted to, and received immunity from prosecution for, selling drugs during the time period of this incident.

A video showed a second unknown figure approach the Raza Tattoo around 3:31 a.m. After the second figure approaches Raza there are many calls exchanged between Jose and Daniel for approximately the next hour, until around 4:31 a.m.. During these calls, Jose is confused because Daniel is claiming that he is owed money, but the amount fluctuates from a million dollars down to five thousand dollars. Jose can hear what sounds like his brother being beaten in the background while he is on the phone with Daniel. Over the phone, Jose can hear another unknown person's voice in addition to Daniel and Jesus. At one point during the telephone conversation, Jose testified that Daniel's voice changed, and he quietly told Jose that "they are going to kill him (Daniel) and his family (Daniel's family). Jose said after Daniel secretly told him this that then Daniel's voice changed again and "he started playing the part again." Daniel continued to threaten to hurt Jesus unless Jose came down to the shop with money.

By approximately 4:30 a.m., Daniel leaves Jesus at Raza Tattoo believing that Jose is on his way. Jose calls other friends to go to the shop, but no on arrives at the shop until close to 6 a.m.. The friends are afraid to enter the shop, so they decide to make an anonymous 911 call around 7:24 a.m.. Jesus' ex-wife also makes a 911 call around 8:00 a.m. after she speaks to Jose. The police do not make entry into the shop until well after 9:00 a.m. that Sunday. Jesus was found deceased inside the shop. He was partially bound, beaten, naked from the waist down, and covered partially by a tarp. Daniel's DNA was not found on Jesus' body, nor was Daniel's DNA found on any of the bindings on Jesus' body. However, an unidentified source's DNA was found in high concentration on the bindings and as a single blood source from a stain found at the scene.

Daniel left the motel that Sunday morning and drove to Mexico. He visited family in Mexico for a couple of days and then returned to the United States on December 20, 2017. Daniel was heavily intoxicated when he was detained at the border. Homicide detectives interviewed him, impounded his vehicle, and released him at the border. Daniel was not arrested for the homicide until August 3, 2017, nearly eight months later.

## BACKGROUND:

Daniel Quintero was born on September 12, 1981, in Colima, Mexico to Adrian Quintero and Gloria Rodriguez. Daniel is the youngest of three brothers from this union.

### Abandonment/Rejection:

Daniel and his brothers were abandoned by their father and mother at an early age. Adrian and Gloria had a volatile relationship that ended shortly after Daniel was born. When Daniel was

just a baby he and his brothers were left in the care of their maternal grandmother, Mariana. Mariana was a violent woman who was believed to be a prostitute. When Daniel was 18 months old, his grandmother took him and his brothers to stay with their maternal uncle and his wife, Marisela. Marisela stated that the boys looked terrible when Mariana dropped them off with only the clothes they had on. The children were ill with high fever and diarrhea and Daniel had a horrible diaper rash. Daniel's bottom and genitalia were red, raw, with bloody blisters and sores. It took Marisela a long time to cure Daniel's injuries.

Physical Abuse/Neglect/Instability:

Marisela knew Mariana was a violent woman and it was obvious to her that Daniel and his brothers had been in an abusive environment. She stated: Alex (client's oldest brother) was extremely irritable and despite being about 5 years old, he could barely talk. Christian (middle brother) was about 3 years old and was also irascible and aggressive. Daniel was merely a baby, but he was very clingy and cried a lot. Daniel demanded a lot of attention and did not want to be left alone.

Eventually, Grandmother Mariana gave the children to their father, Adrian, who took them to live with his new family. Daniel's stepmother Rosa reported: the children looked terrible, they had bloody marks of belts and cord lashes all over their bodies. They were dirty and looked sick and hungry and had their heads covered with lice.

Rosa stated that Adrian took the children with him on his business outings jumping from hotel to hotel missing school for long periods of time. Each time they came home the children were in a deplorable state. The children looked disheveled, hungry, sick, with dry and flaky skin and with head lice. Daniel was constantly sick and was infected with chickenpox and measles.

According to Rosa, Adrian hit all the children including Daniel. Daniel was very young compared to the rest of the children and became almost invisible.

Exposed to Criminal Behavior:

Daniel's father was involved in all types of shady businesses and often forced the children to leave everything behind when he had to flee from angry people who demanded him to pay money that he owed to them.

Christian, Daniel's brother, described their father as a liar, cheater, unstable, violent person. Christian explained that as he got older, he understood that his father was doing illegal things. Their father was a door-to-door salesman who would take money without paying out his vendors. Adrian would move his boys frequently to different cities and states to hide from angry vendors. They would live out of filthy hotel rooms for a couple months at a time before moving on. Christian stated that they were at risk of being killed or badly injured due to all the fraud that their father Adrian committed. Christian remembered that he and his brothers spent a lot of time alone while their father went to bars.

Poverty:

Daniel's family was extremely poor and would often go days without food. His mother and father were hardly around. Daniel's paternal half-sister, Laura, reported that she does not care about their father and thinks the worst of him. Since she was a small child, she hated to see that her father had children with other women and paid no attention to her and her siblings (including Daniel.) According to Laura, they grew up in poverty but didn't starve thanks to her mother (Rosa) who had a humble street stand where she sold tacos. Rosa was the only mother figure that Daniel had as a young child.

Alcoholism:

When Daniel was about 11-12 years old, he moved to San Diego to live with his mother. Daniel left his two brothers because they refused to go with their mother. When Daniel was about 13 years old, he and his mother moved to Alaska for a period of time when she married a man named Matias. Per Daniel's stepfather Matias, Daniel's mother Gloria was an alcoholic who used him to gain legal residence in Alaska where they met and where she brought Daniel to live with them. Matias said that Gloria drank, liked to party, and constantly had friends over. Matias reported that he didn't remember much of Daniel who was just a boy and spent a lot of time playing videogames in his room. Matias was an alcoholic and had an abusive relationship with Daniel's mom. When Daniel's brother, Alejandro, went to Alaska to visit Daniel he was worried when he saw beer under Daniel's mattress. Eventually, Gloria and Matias divorced, and Daniel and his mother returned to San Diego.

Jorge, Daniel's maternal uncle, reported that alcoholism runs deeply in his family. His father, mother, and grandparents drank a lot and all died of alcoholism related illnesses. Jorge recalled his grandmother was delusional and had nightmarish hallucinations. He said that back in the day it was common for children to mingle with drinking adults and that the adults customarily sent the children to the store to buy alcohol.

Good Deeds and Traits:

Daniel's nephew, Carlos, stated that unlike most of his extensive family, Uncle Daniel is very caring and uses nice words when talking to people. When Uncle Daniel came to town to visit the family, he brought everyone gifts and took the time to stop by their houses to see them to find out how they were doing. Uncle Daniel never used foul language and treated people with respect. Carlos looks up to Uncle Daniel and considers him a father.

Daniel's stepmother, Rosa, thinks fondly of Daniel. She reported that Daniel stayed in touch with her and when he visited her, he always brought gifts and gave her money. Anytime she needed financial help, Daniel always helped her out. She always knew that he was the only one she could rely on and hoped that in her old days, Daniel would be watching over her.

Daniel's paternal half-sister, Laura, said that everyone in the family liked Daniel because from the time he was a small child, he was easy going and hardworking; he was always running errands for neighbors to earn some money.

It should be noted that Daniel has no prior criminal convictions.


Good Father

Jacqueline Cardenas and Daniel have a son together, Drako. Daniel was a stepfather to Jacqueline's sons Bryan and Anthony. Jacqueline, Drako, Bryan and Anthony all described Daniel as a good father. Daniel provided for the family and made sure to spend time with them. Bryan and Anthony came to see Daniel as a father-figure, even though they are not biologically related. Daniel liked to give them all life advice and wanted them to be successful.

Daniel also has a daughter named Naomi with Joanna Ramirez who lives in Tijuana. Joanna described Daniel as an attentive father to his daughter and to his stepson, Luis. Luis loves Daniel as if he is his biological father. According to Johanna, Daniel lived to make Naomi, Luis, and Drako happy. Daniel was Johanna's main source of income and provided the funds to send their daughter Naomi to private school.

All of Daniel's children miss him.

PTSD and Depression:

According to Jacqueline, Daniel was fired from his place of employment, a Federal prison in San Diego, in 2010. Daniel fell into a depression after this. He would drink a lot, listen to sad music, and cry often.

Bryan believes that Daniel's partner was killed or injured by inmates at the prison, and that is why Daniel left and subsequently suffered from PTSD. Bryan recalled this is when Daniel began drinking heavily.

Jacqueline recalled that Daniel tried to commit suicide at least once when he overdosed on pills. Bryan found Daniel on the floor. Daniel saw a psychiatrist and was prescribed medication.

Daniel fell into another depression when his best friend died in January 2016. His drinking became worse after this. Daniel had gastric bypass surgery which exacerbated his alcoholism.

At time of the incident, Daniel was working consistently as a truck driver.

**DR. RYAN O'CONNOR:**

Dr. Ryan O'Connor is an attending physician in emergency medicine, medical expert witness and forensic medical consultant. He has an M.D. from the New York Medical College and a Master of Science Degree in Criminalistics from California State University, Los Angeles. At the request of defense counsel, he reviewed Daniel's case and testified at Daniel's trial.

Dr. O'Connor testified that alcohol globally inhibits brain function and thought process becomes slow and confused. Dr. O'Connor testified that a person under the influence of alcohol

could enter a black out state where the person can be highly functioning with no memory of their actions the next day. He described this as automatism that can occur with high level of alcohol intoxication. Dr. O'Connor testified that "a lot of our decision-making process and rationale for doing things is based on memory recall, both short-term and long-term. Therefore, if memory is impaired (from alcohol consumption) then reasoning and comprehension can be impaired.

One of the more interesting things mentioned by Dr. O'Connor at Daniel's trial, is that a person who has had gastric bypass surgery is more likely to have their alcohol level rise more quickly than a person who has not had bypass surgery. Given that Daniel has had gastric bypass surgery and he testified to an excessive drinking pattern during the time of the incident, it is more likely that his reasoning and comprehension was impaired during the incident.

Dr. O'Connor did not interview Daniel. However, this is Dr. O'Connor's practice with subjects who have experienced an alcoholic blackout. This is because people who have experienced a blackout often suffer from memory loss regarding the events that occurred while under the influence. Given that they do not remember, they are highly susceptible to suggestion, and can come to believe that things happened that did not actually occur.

## CONCLUSION:

A common theme that I noticed when interviewing family and friends of Daniel was that they all believed that Daniel was not a violent guy, and that the only reason that this could have happened was because of the effects of his excessive alcoholism. I think that it is true, that but for the alcohol, Jesus Quiroz would still be alive, and Daniel would still be out trying to provide for his family. I still think that Daniel deserves every chance that can be given to him. I would ask the Court and any subsequent authorities that will be responsible for Daniel's freedom to give him that chance.

Sincerely,

*Mignon Q. Hilts*

Mignon Q. Hilts
Deputy Public Defender

Cc:     David Grapilon, Deputy District Attorney
        Probation Department

# EXHIBIT E

**DWYER + KIM, LLP**
601 Van Ness Ave., Suite E-115
San Francisco, CA 94102
Telephone: 415.994.2893



John P. Dwyer
Certified Appellate Law Specialist
dwyer@dwyerkim.com

*Confidential and Privileged: Attorney-Client Communication*

August 10, 2022

Daniel Rodriguez Quintero, BN3161
Pleasant Valley State Prison
P.O. Box 8500
Coalinga, CA 93210

*People v. Quintero*, Court of Appeal No. D077996
San Diego County Superior Court SCS303737

Dear Mr. Quintero:

I regret to inform you that today the California Supreme Court denied review in your case. This ends the state court appeals of your conviction and sentence, and it also ends my representation of you.

If you wish to pursue further relief, you have three options you can pursue on your own.

*First*, you may file a petition for a writ of certiorari in the United States Supreme Court asking it to review your case. The only issues you can raise are federal constitutional issues that were presented to the California Supreme Court in the petition for review. The Court grants review in very few cases – fewer than 100 per year nationwide. Nonetheless, if you decide to file a petition for a writ of certiorari, you must file it within 90 days from the date of the California Supreme Court's order denying review.

*Second*, you may file a state petition for writ of habeas corpus in state court to challenge your convictions and sentence on grounds that I did not raise in the appeal. The petition may be filed in the superior court, the Court of Appeal or the California Supreme Court. All of these courts have jurisdiction to entertain habeas petitions. If you want to pursue a challenge to your convictions and/or sentence through a writ of habeas corpus, you should proceed promptly because the courts can refuse to entertain habeas claims that are not pursued within a reasonable period of time.

*Third*, you may also seek relief by filing a federal petition for a writ of habeas corpus in the United States District Court. The federal court will only consider claims that were presented to the California Supreme Court and that involve federal constitutional violations. The deadline for filing a federal habeas petition is one year from either the last date for filing a certiorari petition in the U.S. Supreme Court (if you do not file a certiorari petition), or one year from date of the U.S. Supreme Court's denial of a certiorari petition (if you file a certiorari petition). You can file only one habeas petition in federal court. Late filings are not permitted, and you will not get another chance if you miss the deadline.

Please let me know if you want me to send the record to you in prison or to a trusted friend or relative. If the latter, please give me that person's name and address. If I do not hear from you



Daniel Rodriguez Quintero, BN3161
Pleasant Valley State Prison
PO Box 8500
Coalinga, CA  93210

Page 2

in the next two weeks, I will send the record to you in prison.  The record consists of the clerk's transcript (2 volumes), a supplemental clerk's transcript (1 volume), the reporter's transcript (20 volumes), the supplemental reporter's transcript (6 volumes), and the grand jury transcript (5 volumes).

Finally, I received your letters dated July 3 and July 7, 2022.  The letters suggest that I put in only a minimum amount of effort in your appeal.  That is not true.  I worked hard on your appeal and research numerous potential issues.  Unfortunately, I found only one issue that had any chance on appeal, and that is the issue I raise in the briefs.

Your letter also suggest that your trial counsel was inadequate.  If you believe that her representation was inadequate, you should file a habeas petition seeking a new trial on that basis.

I wish you the best of luck in pursuing further relief.

Sincerely,

John P. Dwyer

AO 241
(Rev. 06/13)

Page 1

# Petition for Relief From a Conviction or Sentence
## By a Person in State Custody

### (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

### Instructions

1.  To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from the conviction or the sentence. This form is your petition for relief.

2.  You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3.  Make sure the form is typed or neatly written.

4.  You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5.  Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6.  You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you. If your account exceeds $ ___,01 4 , you must pay the filing fee.

7.  In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8.  When you have completed the form, send the original and ____ copies to the Clerk of the United States District Court at this address:

    Clerk, United States District Court for
    Address
    City, State  Zip Code

9.  **CAUTION:** You must include in this petition all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

10. **CAPITAL CASES:** If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.

STATE OF CALIFORNIA *(LEGAL PACKETS MUST BE APPROVED BEFORE COPYING)* DEPARTMENT OF CORRECTIONS
CDC - 193 (1/88)

# TRUST ACCOUNT WITHDRAWAL ORDER

Start: 4|34|14g
End: 4|34|15g
Total      6

TO: Warden

Approved _____ A _____

Date __20 Sep__ 20_2 2_

I hereby request that my Trust Account be charged $ ____ . 8O ____ for the purpose stated below and authorize the
withdrawal of that sum from my account:

__BN3261__
Number

_(signature)_
Name. (signature please. DO NOT PRINT)

PRINT PLAINLY BELOW name and address of person
to whom check is to be mailed.

State below the PURPOSE for which withdrawal is requested
( do not use this from for Canteen or Hobby purchase).
**Check what is being purchased only Do Not Fill in $ Amounts:**

PURPOSE __2__ Set of Legal Copies Needed (.10 Each) $ _____

NAME _____

ADDRESS _____

| Envelopes Needed: | | Forms Needed: | |
|---|---|---|---|
| ___ 10x13  (.20 each) | $ ___ | ___ 28 Line | (.10) $ ___ |
| ___ 10x15  (.25 each) | $ ___ | ___ 28 No line | (.10) $ ___ |
| ___ 12x15  (.30 each) | $ ___ | ___ | |
| ___ 6 x 9  (.15 each) | $ ___ | | |
| ___ #10  (.05 each) | $ ___ | | |

_Quinton Grace_
PRINT YOUR FULL NAME HERE

1

2

3

4

5

6                 IN THE UNITED STATES DISTRICT COURT

7                 EASTERN DISTRICT OF CALIFORNIA

8      Quintero Daniel R.

9                 Plaintiff,

10   vs.                                     No. SCS 303737

11     Warden T. Lemon

12          Defendant(s).            **PROOF OF SERVICE**

13   _____ /

14          I, the undersigned, hereby certify that I am over the age of eighteen years and

15   on  September                        , 20_____, I served a copy of

16   _____

17   by placing a copy in a postage paid envelope addressed to the person hereinafter listed

18   by depositing said envelope in the United States Mail:

19

20

21

22   I declare under penalty of perjury that the foregoing is true and correct.

23

24          _____

25                            (Signed)

26

                                            Attachment 7